919 So.2d 217 (2005)
CITY OF LAUREL, Mississippi, Appellant,
v.
Mark BREWER, Appellee.
No. 2003-CC-02630-COA.
Court of Appeals of Mississippi.
June 21, 2005.
*219 Deidra J. Bassi, Leslie Pettis Barry, Laurel, attorneys for appellant.
Timothy M. Farris, Hattiesburg, Steven J. Irwin, for attorneys for appellee.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. Officer Mark Brewer, a member of the Laurel Police Department, was conducting an investigation regarding possible illegal drug activity. He was accompanied by Officers Satcher and Berlin. Larry Kent Breland disrupted this investigation and physically attacked Officer Satcher. During the altercation, Brewer released a K-9, a trained police dog, to help control the crowd that had formed. Officer Satcher attempted to arrest Breland, but Breland resisted the arrest. To assist Officer Satcher, Brewer directed the K-9 away from the crowd and towards Breland, and Officer Satcher was able to effect the arrest with the help of the K-9.
¶ 2. The City of Laurel conducted an internal investigation to ascertain whether the release of the K-9 was excessive force. The chief of police and mayor reviewed this investigation and decided that Brewer should be terminated for violation of various city and department rules and standards. The City also filed criminal charges against Brewer.
¶ 3. Brewer appealed the City's termination to the civil service commission. At Brewer's request, the hearing was delayed until Brewer's criminal charges were adjudicated. The civil service commission reinstated Brewer but denied Brewer's request for back pay.
¶ 4. The City appealed the civil service commission's decision to the Jones County Circuit Court, and Brewer cross-appealed for back pay. The circuit court affirmed the civil service commission's decision to reinstate Brewer but reversed the commission's denial of back pay. The City of Laurel appeals to this Court, raising the following issues:
I. WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE CIVIL SERVICE COMMISSION'S RULING TO REINSTATE BREWER
II. WHETHER THE CIRCUIT COURT ERRED IN REVERSING THE COMMISSION'S DECISION TO DENY BACK PAY
¶ 5. Finding that the civil service commission's order was supported by substantial *220 evidence, we affirm Brewer's reinstatement but reverse the circuit court's order to award back pay.

FACTS
¶ 6. On March 26, 2001, Officer Mark Brewer of the Laurel Police Department responded to an emergency call. He was dispatched to investigate possible illegal narcotic activity. The neighborhood was in a high crime area that was known for having frequent drug activity. Brewer responded to this call with his K-9. Also responding to the call were Officers Clarence Satcher and Joe Berlin.
¶ 7. After conducting an initial investigation into the alleged narcotic activity, the officers were interrupted by the actions of Larry Kent Breland. Breland used profanity directed at Officer Satcher and physically attacked him. Officer Satcher attempted to arrest Breland for interfering with police business, but Breland resisted the arrest. A crowd which was hostile to the police officers began to form, and Brewer used the K-9 to help control the crowd. Officer Satcher took Breland to the patrol car, where he continued to command Breland to cease his resistance and place his hands on the car. Breland head butted Officer Satcher, resulting in contusions and abrasions to Officer Satcher's face and causing Officer Satcher to become momentarily dazed. Officer Satcher eventually placed at least one handcuff on Breland, but was unable to complete the arrest. It is undisputed that Officer Satcher had at least one handcuff on Breland, but the evidence is conflicting as to whether Officer Satcher had both handcuffs on Breland. To assist Officer Satcher in helping effect Breland's arrest, Brewer and his K-9 turned away from the crowd, and Brewer directed his K-9 to attack Breland. The K-9 performed as it was trained to do and executed a "bite and hold" technique. The dog first bit Breland's left arm and shoulder. When Breland refused to comply with Brewer's verbal demands to stop resisting, the K-9 bit Breland's buttock. When Breland stopped resisting, Officer Brewer ordered the K-9 to release Breland. Officer Satcher then completed Breland's arrest and placed Breland in the patrol car. Breland was taken to a hospital and released when the bite wounds proved to be minor.
¶ 8. The next day, Police Chief John Waterson initiated an internal investigation regarding the incident. Chief Waterson assigned Captain Walter Martin to prepare the report. The internal investigation report contained six written eyewitness statements to the incident, written statements by the officers, copies of relevant use of force and K-9 policies, incident reports, a videotaped statement from Officer Satcher, photos of Officer Satcher, and photographs of Breland and the K-9 bite wounds. The officers concluded that Breland was fully handcuffed when Brewer directed his K-9 to attack Breland and that this conduct was unnecessary and excessive. Chief Waterson recommended to the mayor that Brewer be discharged. The City also filed criminal charges against Brewer.
¶ 9. On April 3, Brewer was informed that the City was citing him for violations of civil service, city and departmental rules and standards. Specifically, he was charged with violations pertaining to adherence to the law, honesty, justice, conduct unbecoming to an officer, and courtesy to the public. He was given until April 5 to respond to the allegations. Brewer declined his opportunity to have a hearing and hired an attorney. On April 9, on the recommendation of Chief Waterson and the City of Laurel's mayor, Brewer was notified that he was being terminated for *221 using excessive and unnecessary force against Breland.
¶ 10. On April 11, Brewer made a formal request that the Laurel Civil Service Commission conduct an investigatory hearing on the discharge. The hearing was initially set for May 8, 2001, but Brewer requested that the hearing be delayed until the criminal case against him was concluded. The city judge and city prosecutor recused themselves from any action relative to the criminal charges pending against Brewer and Breland. On May 24, 2002, the municipal court found Breland guilty of resisting arrest. Pursuant to Mississippi Code Annotated Section 99-3-23, the criminal charges against Brewer were dismissed.
¶ 11. The civil service commission set its investigatory hearing for June 19, 2002; it was continued and completed on June 24. The commission determined that Brewer was terminated without proper cause and ordered that Brewer be reinstated immediately with full pay and benefits. The commission did not award Brewer back pay.
¶ 12. The City appealed the decision of the civil service commission to the Jones County Circuit Court, and Brewer cross-appealed for failure to award him back pay. The circuit court judge, after hearing oral arguments, affirmed the civil service commission's finding that Brewer was discharged without proper cause. It also found that it was an abuse of discretion for the civil service commission to have failed to award Brewer his full back pay from the date of his discharge until the date of his reinstatement. The court later modified its judgment and ordered that Brewer's back pay be reduced by any income earned by Brewer from April 9, 2001 to June 24, 2002.

ANALYSIS

Standard of Review
¶ 13. The civil service commission reviews the employment decisions of a city when a city has removed, suspended, demoted, or discharged a civil service employee. The commission can reverse a city's actions only if the termination was made for political reasons, religious reasons, and/or the termination was not made in good faith for cause. Miss.Code Ann. § 21-31-23 (Rev.2001). The commission will affirm the disciplinary action taken against the employee only when the evidence is conclusive. Id.
¶ 14. An appeal from a decision made by the civil service commission shall be reviewed by the circuit court based on the record which is made by the commission and not de novo. Uniform Rules of Circuit and County Court Rule (URCCC) 5.01. The scope of the circuit court's review is as follows:
On appeals from administrative agencies the court will only entertain an appeal to determine if the order or judgment of the lower authority: 1. Was supported by substantial evidence; or 2. Was arbitrary or capricious; or 3. Was beyond the power of the lower authority to make; or 4. Violated some statutory or constitutional right of the complaining party.
URCCC 5.03.
¶ 15. The circuit court is prohibited from making credibility determinations of the evidence or testimony that was presented to the civil service commission. Instead, the circuit court is charged with determining whether the commission acted in good faith in finding that the city did not have cause to discharge. City of Jackson v. Froshour, 530 So.2d 1348, 1354-55 (Miss.1988). This Court follows the same standard of review as the circuit court and *222 evaluates whether the commission's ruling is supported by substantial evidence. Id. at 1355. Within the context of reviewing a decision of an administrative agency, "substantial evidence has been defined as such evidence `as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred.'" Ladnier v. City of Biloxi, 749 So.2d 139, 147-48(¶ 29) (Miss.Ct.App.1999) (quoting State Oil & Gas Bd. v. Mississippi Mineral & Royalty Owners Ass'n, 258 So.2d 767, 779 (Miss.1971)). This Court is not to determine issues of fact regarding whether an employee was guilty of the charge or not, but should only determine whether the commission acted in good faith based on the evidence before it. City of Meridian v. Davidson, 211 Miss. 683, 709, 53 So.2d 48, 60 (1951).

I. WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE CIVIL SERVICE COMMISSION'S RULING TO REINSTATE BREWER

(A) Whether Breland was fully handcuffed when the K-9 was released
¶ 16. The City believes Brewer's discharge was warranted, in part, based on the fact that Breland was fully handcuffed at the time Brewer released the K-9. There is no dispute that Officer Satcher placed at least one handcuff on Brewer at the time the K-9 was released. There is a dispute as to whether Officer Satcher attached both handcuffs on Breland. The mayor and Chief Waterson testified that it was their belief that Breland was fully handcuffed. Their decision to terminate Breland was based on their finding that Breland was under Officer Satcher's control when the K-9 was released, and this finding consisted of their review of Officer Satcher's videotaped statement, the internal investigation, and the pictures of the K-9 bites on Breland.
¶ 17. On March 29, 2001, Officer Satcher gave a video statement to the City stating that he had both handcuffs on Breland when Brewer released the K-9. The City relied upon Officer Satcher's videotape in determining that Breland was fully handcuffed. However, at the commission hearing, Officer Satcher testified that other police officers coerced him to testify that Breland was fully handcuffed. He testified that after being coerced into giving his video statement, he went to his superior officers, who told Officer Satcher to report the incident to Chief Waterson. Chief Waterson made no efforts to correct the video statement.
¶ 18. The City relied on Tabbitha Windham, an eyewitness to the events surrounding Breland's arrest, to prove that Breland was fully handcuffed at the time Brewer released the K-9. On cross-examination, when she was asked about whether Breland was handcuffed, she testified:
Q (Brewer's attorney): Now, when you were asked on cross examination at the criminal trial whether or not both handcuffs were on Larry Breland at the time that the dog took him down to effect the arrest, your statement was, under oath, you weren't sure, [but] you believed it was.
A: He was. He was.
Q: Okay. Now, there's a difference between what you swore to under oath at the criminal trial and that you believed but not sure, and in what you're saying today. So which is it.
A: He was.
Q: And today you're sure.
A: He was.
Q: At the criminal trial you weren't sure, correct?

*223 A: Correct.
¶ 19. The credibility of Windham's testimony was put into doubt. The City took Windham's sworn statement on March 28, 2001. Windham never signed this notarized statement. Her statement was the only one which was not signed. When the commission chairman asked Windham why her sworn statement was not signed, Windham responded, "I have no idea." At the criminal trial, Windham testified that she was thirty feet away from Breland when he was arrested. At the commission hearing, she testified that she was five feet away.
¶ 20. Captain Martin, who presided over the City's internal investigation of Brewer, explained the scope and content of the investigation. Based on the witness recollections, Officer Satcher's video statement and the photographs depicting the placement of the bite wounds, it was Captain Martin's belief that Breland was fully handcuffed at the time Brewer directed the K-9 to attack Breland. The credibility of Captain Martin, however, was put into question. He was not a witness to the incident and was unaware that Officer Satcher retracted his statement that Breland was fully handcuffed.
¶ 21. In his defense, Brewer called Officer Kent Gillman to testify. Officer Gillman came to the scene after the arrest and did not see the K-9 come into contact with Breland. From what he could see, Breland was not fully handcuffed until after the K-9 attack. Officer Gillman saw Breland's arms about two feet apart from each other, and Officer Satcher was pulling his arms down. Officer Gillman testified that such movements indicate that Officer Satcher did not complete handcuffing Breland until after the K-9 was released.
¶ 22. The civil service commission was presented with substantial evidence that Officer Satcher had not fully handcuffed Breland at the time the K-9 was released.

(B) Whether Brewer's use of the K-9 constituted excessive force
¶ 23. The City of Laurel maintains that Brewer's decision to release the K-9 on Breland was excessive force, regardless of whether Breland was fully handcuffed. In making this argument, the City relies on the testimony of Chief Waterson and the mayor, who both testified that the use of a K-9 was more force than necessary to effect Breland's arrest. The City also relies on the testimony of Captain Martin, who testified that the use of force was unnecessary because Breland was under Officer Satcher's control when the K-9 was released.
¶ 24. The City of Laurel has a "Use of Force Continuum" that is used as a guide for police officers to help them determine how much force should be used. The relevant sections of the "Use of Force Continuum" read as follows:
11.6.4 DECENTRALIZATION
1. To be used in response to active aggression and/or resistance. Acts of active aggression and/or resistance include pulling away or fleeing and attempts to gapple [sic] with or strike an officer.
2. This measure employs heavy techniques of control including empty hand impact and defensive tactics with or without the use of an impact weapon.
11.6.5 INTERMEDIATE FORCE
1. To be used in response to continued active aggression. At this point, a threat of bodily injury to the officer of [sic] others exists.
2. The police baton or other defensive weapon is employed. Police officers shall strike only the arms, legs, and torso areas of the suspect when using intermediate force. The head and neck *224 region are only to be targeted when lethal force is warranted.
¶ 25. The use of a K-9 is not mentioned in the use of force continuum. K-9 use is covered under separate policies. The City argues that the K-9 directives clearly prohibit the use of a K-9 to effect Breland's arrest. The City makes reference to K-9 directives it believes are relevant. On page 9 of the K-9 directives, it states, "Police K-9s will be released to make apprehensions only in felony cases or potentially violent misdemeanors and when no lesser means of apprehension are practical." On page 13 of the K-9 directives the instructions state, "Handlers may use the K-9 for the purpose of apprehending criminal felony suspects when no lesser means of apprehension are practical." An officer shall "[n]ot release the K-9 to apprehend a fleeing handcuffed felony suspect." On page 14 the directives state, "Handlers will not allow their K-9s to bite while in a dispersion action except as a last resort in major disturbances and under riot conditions involving an active, violent crowd." Contrary to the City's position, the K-9 policies do not explicitly state that the use of a K-9 is a greater means of force than the use of a baton, nor do the K-9 policies explicitly prohibit the use of a K-9 when a suspect is resisting an arrest.
¶ 26. Chief Waterson testified that, based on the information he knew, Brewer's conduct in turning the K-9 away from the crowd and allowing it to take Breland down was excessive and inappropriate. Specifically, he testified that while it may have been proper for Brewer to utilize the K-9 for crowd control, the K-9's use of force on Breland was excessive by police standards. In Chief Waterson's opinion, the K-9 was more force than necessary to effect the arrest, regardless of whether Breland was handcuffed. In Chief Waterson's opinion, the more appropriate action for Brewer to take would have been for Brewer to control the crowd and let Officer Berlin, the third uninvolved officer at the scene, assist Officer Satcher.
¶ 27. The mayor testified that before taking action against Brewer, she consulted with Chief Waterson and reviewed the internal investigation report. She testified that the investigation information showed that Officer Satcher had full control over Breland and was capable of effecting an arrest. It was her opinion that Brewer should have stayed with the crowd and allowed Officer Berlin to assist Officer Satcher. The mayor testified that regardless of whether Breland was handcuffed, it was her opinion that Brewer utilized excessive force under the circumstances.
¶ 28. Brewer offered the testimony of Lieutenant David Pickering, Brewer's immediate supervisor. Lieutenant Pickering testified that Officer Stewart, a person uninvolved with the arrest, entered his office and made inappropriate comments to Officer Brewer. Lieutenant Pickering confronted Officer Stewart and told Officer Stewart that he was out of line. Lieutenant Pickering testified that Officer Stewart was angry with Brewer. Officer Stewart, who prepared the internal investigation report upon which Chief Waterston and the mayor relied to terminate Brewer, had never before prepared an internal investigation report. Stated differently, the civil service commission heard evidence that the internal investigation report, a crucial piece of information in the City's decision to terminate Brewer, was unreliable.
¶ 29. Officer Satcher testified that it was appropriate to use the K-9 to effect Breland's arrest because he was unable to arrest Breland without the possibility of hurting him. Officer Satcher testified that he needed assistance because he was unable to take his hand off Breland in order to reach for his baton or spray. Officer *225 Satcher testified that the use of the K-9 was not excessive force and that the use of a K-9 is below the use of a baton in the use of force continuum.
¶ 30. Brewer offered the testimony of Officer Sherman Howell, a K-9 instructor employed by the Petal Police Department. He was qualified as an expert in the training of K-9s and was the officer who trained the K-9 involved in the arrest of Breland. Officer Howell was familiar with the City's use of force continuum and reviewed it for the benefit of the civil service commission. Officer Howell testified that, pursuant to the City's use of force continuum, officers trying to arrest suspects that were fighting with the officers were authorized to use an intermediate use of force. It was his opinion that the use of a K-9 was a lesser means of force than the use of a baton, which is mentioned as a permissible means of defense when intermediate force is warranted. This opinion was based on the fact that a properly trained K-9 ceases to attack a suspect when the suspect stops resisting, based on the fact that the bite and hold procedure is designed to allow the K-9 to gain control over a suspect with the least possible amount of pain, and based on the fact that the K-9 was never released from his leash.
¶ 31. The civil service commission held that Brewer's use of the K-9 was not excessive force, and this finding was supported by substantial evidence. This Court affirms the circuit court's affirmance of the civil service commission's findings.

(C) Whether the Civil Service Commission Was In Error For Relying on the Testimony of Officer Satcher
¶ 32. Officer Satcher testified as to the difficulties he experienced in effecting the arrest of Breland. The crowd was angry because Breland was being arrested. One of the members of the crowd hit Officer Satcher on the shoulder. Breland was wrestling with Officer Satcher as they were moving towards the patrol car. Officer Satcher continuously told Breland to stop resisting and to place his hands on the vehicle so that he could handcuff Breland. Every time Officer Satcher reached for his handcuffs, Breland elbowed and headbutted him. After a long struggle, Officer Satcher managed to get one handcuff on Breland's left hand. At that time Officer Brewer gave notice to everyone that he was releasing the K-9. Because the K-9 is trained to attack anyone who moves, Officer Satcher stopped fighting with Breland. Brewer also warned Breland to stay still. Breland attempted to run away from the car, but the dog bit him and took him to the ground. Breland was told to stop resisting, but he continued his attempts to flee. Breland eventually stopped resisting the dog, and Officer Satcher was able to place both handcuffs on Breland. Officer Satcher testified that he could not have completed the arrest without Officer Brewer's assistance.
¶ 33. The City argues Officer Satcher was not a credible witness and that the testimony of Officer Satcher should not have been relied upon because his statements were inconsistent as to whether Breland was handcuffed when Brewer released the K-9. Officer Satcher gave a statement to the City on March 26, 2001, immediately after the arrest and incarceration of Breland, indicating that Breland was not fully handcuffed. On March 29, Officer Satcher gave a videotaped statement indicating that Breland was fully handcuffed. Officer Satcher later went to the office of Lieutenant Pickering and to the mayor's office to notify his superiors that the videotaped statement was inaccurate. Finally, Officer Satcher testified at the criminal trial and at the civil service commission hearing that Breland was not fully handcuffed.
*226 ¶ 34. At the civil service commission hearing, Officer Satcher explained why his videotaped statement was inaccurate and why he changed his story. On March 29, Officer Satcher was paged several times to come to the Laurel Police Department immediately. Two investigators and Captain Martin asked Officer Satcher to recall the dog bite incident, and Officer Satcher told them that Breland was not handcuffed at the time the dog was released. Captain Martin and the investigators accused Officer Satcher of lying. After interrogating Officer Satcher for twenty minutes, the investigators brought in a video camera. Officer Satcher, who was a criminal suspect at the time, was read his Miranda rights. By this point, Officer Satcher began to doubt whether Breland was handcuffed. Officer Satcher gave his videotaped statement in which he stated that he had placed both handcuffs on Breland. Officer Satcher testified that he was reluctant in giving this statement because he was not sure it was accurate.
¶ 35. Officer Satcher was concerned that his statement on videotape was not an accurate explanation of the events leading to Breland's arrest. On March 30, Officer Breland called Lieutenant David Pickering and told him exactly what happened. Officer Satcher stated that Officer Martin's interrogations led him to give an inaccurate videotaped statement. Lieutenant Pickering told him to call Captain Eddie Ingram, who in turn contacted Chief Waterson. Officer Satcher also talked to the mayor, who refused to believe that the video statement was inaccurate because Officer Satcher did not look coerced in the video.
¶ 36. Issues of credibility are to be determined by the civil service commission. Nelson v. Miss. State Bd. of Veterinary Med., 662 So.2d 1058, 1062-63 (Miss. 1995). This Court is concerned only with the reasonableness of the administrative order. McFadden v. Miss. State Bd. of Medical Licensure, 735 So.2d 145, 152(¶ 26) (Miss.1999). This Court finds that the civil service commission was within its discretion in finding that Officer Satcher was a credible witness and that his version of the events that took place on March 26 and 29, 2001, were accurate.

II. WHETHER THE CIRCUIT COURT ERRED IN REVERSING THE COMMISSION'S DECISION TO DENY BACK PAY
¶ 37. The civil service commission denied Brewer's request for back pay, but the circuit court reversed, finding the denial to be an abuse of discretion. The civil service hearing was initially set for May 8, 2001, approximately one month after Brewer's termination. Brewer requested that the hearing be postponed until after the criminal charges against him were adjudicated. Brewer argues that he is entitled to back pay because his criminal matter was postponed through no fault of his own. Brewer claims that the City intentionally delayed the criminal proceeding for an entire year and that the delay deprived him of the pay that he would have otherwise received.
¶ 38. Mississippi Code Section 21-31-23 (Rev.2001) provides that "reinstatement shall, if the commission so provides in its discretion, be retroactive, and entitle such person to pay or compensation from the time of such disciplinary action." In the case sub judice, the commission ordered Brewer to be reinstated immediately, but it did not order Brewer to be reinstated retroactively.
¶ 39. The civil service commission has discretion to deny back pay just as it has discretion to modify a city's order of discipline. Beasley v. City of Gulfport, 724 So.2d 883, 887-88(¶ 22) (Miss.1998). *227 Therefore, the civil service commission's award or denial of back pay should be affirmed if it is supported by substantial evidence. In Beasley, the civil service commission reinstated Beasley but denied Beasley's back pay. The commission found that there was substantial evidence of misconduct on the part of Beasley, but the misconduct was not sufficient to terminate him. Based on this evidence, the supreme court affirmed the commission's decision to reinstate without back pay. Id. at 888-89(¶ 27). Similarly, in the case sub judice, the evidence supports a finding that Brewer engaged in misconduct that was not serious enough to warrant termination.
¶ 40. The evidence shows that the delay in the adjudication of the civil service hearing was caused by the actions of Brewer himself. Brewer insisted on delaying the civil service hearing until after the criminal matter was resolved, and Brewer requested continuances of the criminal matter itself. When the city judge and prosecutor recused themselves from Brewer's criminal matter, the City quickly appointed a temporary judge and prosecutor, in an order dated June 7, 2001. Brewer's criminal matter was initially set for February 5, 2002. Brewer's counsel requested that the matter concerning Breland be consolidated with Brewer's case. This request was granted, and the matter was reset for March 26, 2002, and then postponed again until May 21, 2002. When an employee is entitled to back pay, he has a duty to mitigate his damages. Eidt v. City of Natchez, 382 So.2d 1093, 1095 (Miss.1980).
¶ 41. The civil service commission's denial of Brewer's back pay was supported by substantial evidence. On this issue, we affirm the civil service commission and reverse and render the decision of the circuit court.
¶ 42. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. THE JUDGMENT OF THE CIVIL SERVICE COMMISSION FOR THE CITY OF LAUREL IS REINSTATED IN TOTO. COSTS OF THIS APPEAL ARE ASSESSED IN EQUAL PARTS BETWEEN THE APPELLANT AND THE APPELLEE.
BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J.
IRVING, J., dissenting:
¶ 43. I cannot agree with the majority decision affirming the judgment of the Circuit Court of Jones County which affirms the order of the Civil Service Commission of the City of Laurel (Commission). The Commission reversed the decision of the City of Laurel (City) terminating police officer Mark Brewer because of his exercise of excessive force in assisting a fellow officer execute the arrest of a citizen.
¶ 44. There are two reasons why I cannot join my colleagues in the majority. First, I think the Commission either exceeded its jurisdictional powers or employed an improper standard. Second, I think our responsibility of adherence to precedence requires that this case either be reversed and remanded or held in abeyance and an order issued to the Commission to make specific findings of fact as we required in Bowie v. City of Jackson Police Department, 816 So.2d 1012, 1018(¶ 21) (Miss.Ct.App.2002). As the record now stands, we have nothing to review because the Commission made no findings of fact. Therefore, I respectfully dissent.
¶ 45. The majority cites the proper standard and correct parameters of the *228 Commission's powers when conducting an investigation of a person discharged by an appointing power, such as the City. However, it seems to me that the majority opinion ignores the fact that the Commission either overstepped its powers or applied an improper standard in rendering its decision.
¶ 46. The majority focuses only on the appellate standard of review of the Commission's decision. In my judgment, we should first focus on whether the Commission exceeded its powers in conducting its investigation or whether it used an improper standard in arriving at its decision. If it exceeded its powers, then what it found or held is irrelevant. Likewise, if it used an improper standard, then its decision must be reversed for application of the proper standard.
¶ 47. As the majority correctly notes, the Commission is "confined to a determination of the question of whether such disciplinary action was or was not made for political or religious reasons and was or was not made in good faith for cause." Miss.Code Ann. § 21-31-23 (Rev.2001).
¶ 48. After such investigation the commission may, if in its estimation the evidence is conclusive, affirm the disciplinary action, or if it shall find that the disciplinary action was made for political or religious reasons, or was not made in good faith for cause, shall order the immediate reinstatement or reemployment of such person in the office, place, position, or employment from which such person was removed, suspended, demoted, discharged or combination thereof....
Id. (emphasis added). It is clear from the statute that the Commission lacks the power to make its ultimate factual determination without applying the good-faith analysis to the City's actions.
¶ 49. The majority opinion also focuses on whether there was substantial evidence to support the Commission's ruling to reinstate Brewer. Although I agree that we review the decision of the Commission to determine if there is substantial evidence to support it, the Commission, however, in making its decision, must follow the dictates of the statute which authorizes it to act. We are not required to give deference to a Commission's finding when that finding was not in accordance with the legal standard imposed upon the Commission.
¶ 50. I begin my analysis by quoting the following order entered by the Commission:
A full investigative hearing was conducted before the Civil Service Commission of the City of Laurel, Mississippi on June 19th, [sic] and June 24th, 2002, [sic] regarding the appeal to reinstate Mark Brewer to the position of police officer for the City of Laurel Police. Following said hearing, the Commission entered into executive session to deliberate the evidence presented and reach a decision. After through [sic] review, the Commission concluded that Mark Brewer was terminated without proper cause.

IT IS THEREFORE ORDERED that the termination of Mark Brewer be lifted and that the City of Laurel re-instates [sic] him effective immediately with full pay and benefits.
SO ORDERED this 24th, [sic] day of June, 2002.
/s/ Tony Wheat, Chairman, Civil Service Commission, Ward 2
¶ 51. The crux of my argument on this first point centers around the following sentence in the Commission's order: "After a through [sic] review, the Commission concluded that Mark Brewer was terminated without proper cause." The issue *229 for the Commission was not whether the City terminated Brewer without proper cause but whether the City made the termination in good faith for cause. There is a difference. Moreover, what does "without proper cause" mean? Considering the fact that the statute enumerates two prohibited reasons, "political" and "religious" for terminating an employee, was the Commission finding that Brewer was terminated for political or religious reasons? Or, was the Commission finding that Brewer was terminated for some other reason but that the other unspecified reason was not a proper reason? A termination for political or religious reasons does not invoke the good-faith analysis. Any other cause-based termination is subject to the good faith analysis and is not subject to being rejected by the Commission as not a proper cause unless the Commission first finds that the City did not act in good faith.
¶ 52. We know from the facts that Brewer was terminated for using excessive force in the execution of the arrest of Larry Kent Breland. Surely the Commission and the majority do not mean that the use of excessive force by a police officer against a citizen in order to effect the arrest of that citizen is not a proper reason for terminating the officer. So what does the Commission's order mean? We know that terminating an officer for religious or political reasons is not a proper reason for the termination. Yet, the Commission did not find that either of these reasons was in fact the reason for the termination or that the reason given by the City was pretextual.[1]
¶ 53. As I appreciate the record, the City terminated Brewer for directing his K-9 police dog to attack Breland. The majority spends a good bit of time discussing the facts as they relate to the disputed question of whether Officer Clarence Satcher had one or both handcuffs on Breland when Brewer directed his K-9 to attack Breland. I suppose the purpose of this discussion is to somehow demonstrate that the City erred in its conclusion that both of Breland's hands were in handcuffs when Brewer instructed the K-9 to attack. It is important to point out at this juncture that the City's police chief, John T. Waterson, testified that he was of the opinion that excessive force was used even if Breland was unhandcuffed or partially handcuffed. Moreover, even if the City erred, and there is a plethora of evidence that it did not, that would not be a basis for overturning the City's decision to terminate Brewer because what is required is a finding by the Commission that the decision to terminate was not made in good faith for cause. Clearly, there can be a determination that is made in good faith but which in hindsight turns out to be an error.
¶ 54. And speaking of judgment and error, it should be noted that John T. Waterson, the Chief of Police of Laurel who recommended Brewer's termination, has thirty-eight years in law enforcement, twenty-two years with the Dallas Police Department, seven years in the private sector in corporate security, six years as chief of police of Russelville, Arkansas, and three years as chief in Laurel. Surely, *230 this man must know something about the proper use of force in executing an arrest. Chief Waterson testified that Breland is a small man and that Officer Satcher, alone, should have been able to effect the arrest. In any event, Chief Waterson testified that Officer Berlin, the other officer on the scene, should have assisted Officer Satcher if some help was needed, leaving the K-9 to be used to assist in the crowd control if needed. In other words, it was the chief's opinion that the use of a second police officer would have been a lesser practical means of subduing Breland.
¶ 55. The majority also discusses the testimony of Officer Satcher and Officer Sherman Howell, a K-9 instructor employed by the Petal Police Department. Both of these individuals believed that the use of the K-9 was appropriate under the circumstances and permissible under the City's "Use of Force Continuum" and K-9 directives. The fact that these officers differed with Chief Waterson over whether Brewer used excessive force in arresting Breland does not mean that the City did not make its decision in good faith. Again, there can be errors in judgment in making certain determinations, but that does not mean or prove that the determination was made in the absence of good faith. More importantly, the fact that someone else similarly situated may have made a different determination, does not prove that the other person made an error in judgment or that the other person was operating without good faith in arriving at a different determination.
¶ 56. The City's decision to terminate Brewer was based in part on the testimony of Officer Satcher who stated on videotape that he had both of Breland's hands in handcuffs when Officer Brewer commanded the K-9 to attack. The majority apparently finds substantial evidence in the fact that Satcher later recanted and claimed that he had been pressured to make the statement. Well, there have been a lot of criminal defendants who first told the truth but later changed their minds and claimed to have been pressured. When they presented their claim of pressure to this Court and to the Mississippi Supreme Court after being rejected by the trial courts, we, as well as the supreme court, rejected their claim and sent the defendants on their way to their new home, the Mississippi State Penitentiary. I can think of no reason why a confessing police officer ought to be treated any differently. The mayor of the City of Laurel testified that she reviewed Satcher's videotaped statement and that he did not appear pressured to her. Why should her testimony not be given the same deference, in determining the voluntariness of Officer Satcher's statement in this civil case, that we routinely accord to the testimony of police officers who frequently are called upon to testify in criminal cases when a criminal defendant claims that his confession was not made voluntarily? Moreover, when Officer Satcher gave the videotaped statement he was a criminal suspect who had been read his Miranda rights. Why should the statement that he made after being advised of his rights be disbelieved on the basis that it was coerced? If anyone knows that he has a right to remain silent after being read his rights, surely a policeman must be one.
¶ 57. Finally, I turn to my second reason for disagreeing with my colleagues in the majority. As I stated in the introductory portion of this opinion, the Commission made no findings of fact. Therefore, we have no findings to review.
¶ 58. In Bowie, a case that is factually similar to the facts in our case, the Commission initially "issued an order stating that the City's firing of Bowie was in good faith." We held that such action was not *231 enough and "issued an order directing the Commission to make a finding of fact [sic] in accordance with the statute." Bowie, 816 So.2d at (¶¶ 21-22). We ultimately affirmed the decision of the Commission but only after it had made the specific findings of fact that we requested. Bowie, 816 So.2d at (¶ 23). In reaching our decision in Bowie, we relied in part on the City of Jackson v. Froshour, 530 So.2d 1348, 1355 (Miss.1988) wherein the Mississippi Supreme Court held that a civil service "[c]ommission is under a duty to set forth with sufficient clarity and specificity the reason it is uphold the action taken by the city, as well as it is the duty of the city to set forth clearly the reasons for its disciplinary action." The City shouldered its burden under Froshour and Bowie, but the Commission did not.
¶ 59. The Commission issued an order that simply said, "Mark Brewer was terminated without proper cause." Based on Froshour and Bowie, such action is not enough. Therefore, it seems to me that, at the least, we must reverse and remand this case or send an order to the Commission to make specific findings of fact. I cannot see how we can do otherwise.
KING, C.J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] There was some assertion by Brewer, in the form of evidence or insinuation, that the Mayor of the City of Laurel had expressed concern that the brutal arrest of Breland would somehow impact her reelection chances. The chief of police, however, who recommended that Brewer be terminated testified that he had not heard anything about this assertion at the time that he recommended the termination and that his recommendation was based on the fact that he determined that Brewer used excessive force in making the arrest.