ROBERTS, J., for the Court:
¶ 1. Scote Renfro appeals his termination as a police officer for the City of Moss Point, Mississippi (the City), for insubordination. The Moss Point Civil Service Commission (the Commission) found that the City acted in good faith when it terminated Renfro for cause. Renfro appealed to the Jackson County Circuit Court, which affirmed the Commission’s judgment. Renfro appeals and claims that there was not substantial evidence to support the Commission’s decision. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Renfro’s termination stemmed from events that occurred shortly after midnight on June 16, 2011. Renfro was off-duty at that time. Although he had been at his home, he “got bored, and decided to ride into Moss Point.” Renfro had a portable police radio with him.
¶ 3. Officer Ricky Guerrero was on duty that night. After responding to a burglary call, Officer Guerrero heard Renfro over the radio. According to Officer Guerrero, he heard his name, but initially he could not understand Renfro. When Renfro repeated himself, Officer Guerrero realized that Renfro was reporting that he had seen a drug transaction, and he wanted Officer Guerrero to arrest someone involved in the transaction. Officer Guerrero responded to the area that Renfro described.
¶ 4. After Officer Guerrero stopped his patrol car, Renfro drove his Ford F-250 *915 pickup next to him. Officer Guerrero later testified that he did not see Renfro face to face. Renfro told Officer Guerrero that “he was going to go back by and see if the vehicle was still there.... He then departed, went back by [the house], and he informed [Officer Guerrero] on the radio that the vehicle was leaving.” Officer Guerrero followed the vehicle and stopped it. He arrested one of the occupants for misdemeanor possession of narcotics. Officer Guerrero later clarified that he had arrested the occupant for possession of “a couple pills.”
¶ 5. Officer Guerrero was concerned about the way Renfro sounded. According to Officer Guerrero, Renfro’s speech was slurred, and “he might have been intoxicated.” Officer Guerrero contacted Deputy Jackie Trussell of the Jackson County Sheriffs Department because he was a friend of Renfro’s. Officer Guerrero asked Deputy Trussell to tell Renfro that he needed to go home. The record is silent as to whether Deputy Trussell followed through with Officer Guerrero’s request.
¶ 6. Corporal Lance Shipman was also concerned by the way Renfro sounded over the radio. Corporal Shipman called Lieutenant Brandon Ashley and asked him to listen to Renfro. Lieutenant Ashley later reported that Renfro “was talking incoherent[ly] with slurred speech.” Lieutenant Ashley also reported that he thought Renfro “was under the influence of an unknown substance.”
¶ 7. Corporal Shipman went to the area where Renfro had been with Officer Guerrero, but he could not find Renfro. Corporal Shipman called Renfro and talked to him. According to Corporal Shipman, Renfro was hard to understand. When Corporal Shipman asked Renfro what he was doing, Renfro said that “he was doing something for [a] task force.” Corporal Shipman asked Renfro to meet with him, but Renfro declined. Renfro told Corporal Shipman that he was going home. But a short time later, Corporal Shipman heard Renfro requesting information regarding a Harrison County license plate.
¶ 8. Meanwhile, Corporal Shipman had received a call that a burglary was in process. Corporal Shipman responded to the call. He requested assistance from other officers, but the other two officers on duty had been tied up with Renfro’s report of a misdemeanor drug transaction. When Officer Guerrero was on his way to meet Corporal Shipman, Officer Guerrero was involved in a traffic accident. As a result, Corporal Shipman had to respond to the burglary without any backup. During a foot pursuit, someone tried to run over Corporal Shipman with a car, but he managed to avoid it.
¶ 9. At approximately 1:15 a.m., Corporal Shipman called Keith Davis, the Moss Point chief of police. Corporal Shipman told Chief Davis about the events that had transpired that night. Corporal Shipman also relayed his concern that Renfro sounded intoxicated over the radio. After he spoke to Corporal Shipman, Chief Davis called Renfro. Chief Davis agreed that Renfro’s speech was slurred. When Chief Davis asked where Renfro was, he said that he was on the couch in his apartment.
¶ 10. Chief Davis sent two officers to Renfro’s apartment with instructions to administer a portable breath test. Although the officers arrived within fifteen minutes of Renfro’s claim that he was in his apartment, Renfro did not answer his door. However, the officers noticed that Renfro’s Ford F-250 pickup truck was parked nearby, and the engine was still warm. Chief Davis tried to call Renfro again, but he did not answer the phone.
*916 ¶ 11. At approximately 8:00 a.m. the next morning, Chief Davis sent two more officers to Renfro’s apartment. Again, Renfro did not answer the door. The officers heard a phone ringing inside Renfro’s apartment. According to Chief Davis, he believed that Renfro only had a cell phone. Chief Davis then personally went to Ren-fro’s house, but he was still unable to contact Renfro.
¶ 12. Eventually, Chief Davis contacted Renfro by phone. Renfro claimed that he was at a friend’s house in Pascagoula, Mississippi. Chief Davis told Renfro to come to the police department. Renfro complied. He finally arrived at the police department between 10:00 and 11:00 a.m.
¶ 13. Chief Davis gave Internal Affairs Officer Don Butler authority to investigate Renfro’s behavior, including administering a portable breath test and questioning him after he signed a Garrity[1] form advising him that his responses could not be used as evidence to convict him of a crime. However, Renfro refused to take a portable breath test or sign the Garrity form. Officer Butler later testified that Renfro was “very argumentative.” Renfro told Officer Butler that Chief Davis could personally give him a portable breath test if he wanted one. Chief Davis described Renfro as “confrontational, extremely agitated[, and] very insubordinate.”
¶ 14. Chief Davis told Renfro that he did not have an option to refuse to take the portable breath test or sign the Garrity form. Renfro finally took the portable breath test, which indicated that his blood-alcohol content was .075%. Renfro claimed that the test results were due to the fact that he had just eaten a cough drop, but Chief Davis testified that he smelled alcohol on Renfro. Renfro also signed the Garrity form, but he then refused to answer any questions before he talked to his lawyer. Renfro was allowed to call his lawyer. But having been involved with Renfro for approximately ten hours, Chief Davis wanted to prevent further disruption by Renfro, so he suspended him with pay.
¶ 15. The next day, Renfro received written notice of his suspension with pay. Five days later, Renfro received a pre-termination letter. The letter notified Renfro of Chief Davis’s recommendation that the City terminate Renfro “for insubordination and conduct unbecoming an officer related to [his] actions on June 16, 2011.”
¶ 16. Renfro requested a pre-termi-nation hearing, which occurred on July 7, 2011. Afterward, the City terminated Renfro. Renfro then requested a hearing before the Commission. Officer Butler, Chief Davis, Officer Guerrero, and Corporal Shipman testified during the hearing. Subsequently, the Commission found that the City did not terminate Renfro for political or religious reasons. The Commission also found that the City terminated Renfro in good faith and for cause. Therefore, the Commission affirmed the City’s judgment. Renfro appealed to the circuit court, which also affirmed. Renfro appeals.
ANALYSIS
¶ 17. Renfro claims that the Commission’s decision was arbitrary, capricious, *917 unreasonable, and beyond its authority. According to Renfro, the City failed to present sufficient evidence that he was insubordinate. Renfro argues that he followed the Moss Point Police Department’s standard operating procedure when he reported a crime while off-duty. Additionally, Renfro notes that there was no evidence that he was intoxicated at the time he reported the crime. Renfro further argues that the City could not have found that he refused to take a portable breath test because he took one the following morning. Finally, Renfro claims that the City could not have found that he was insubordinate for refusing to answer questions under Garrity, because Chief Davis suspended him before he had an opportunity to answer any questions.
¶ 18. A police officer “may be ... discharged ... for ... insubordination....” Miss.Code Ann. §21-31-21 (Rev. 2007). A discharged police officer may appeal his or her termination to a civil service commission, which shall determine whether the decision to terminate the officer “was or was not made for political or religious reasons and was or was not made in good faith for cause.” Miss.Code Ann. § 21-31-23 (Rev. 2007). On appeal, we must determine whether the Commission’s decision “was in good faith for cause.” City of Jackson v. Froshour, 530 So.2d 1348, 1355 (Miss.1988). “Intertwined with this question is whether ... there was substantial evidence before the ... Commission to support its order[,] and whether it is arbitrary, unreasonable, confiscatory, and capricious.” Id.
¶ 19. We must employ a limited standard of review. Id. We are prohibited from substituting our judgment for the City’s. Id. Instead, we must determine whether substantial credible evidence supports the City’s decision. Id. “Courts are not empowered to supervise the intelligence, wisdom[,] or fairness of the governing authorities.... ” Id. Similarly, we are “prohibited from making credibility determinations of the evidence or testimony that was presented to the ... [C]ommission.” City of Laurel v. Brewer, 919 So.2d 217, 221 (¶ 15) (Miss.Ct.App.2005). “[Substantial evidence has been defined as such evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. (internal quotation marks omitted). Finally, this Court is not called upon to determine issues of fact regarding whether an employee actually committed the alleged misconduct that led to his or her termination. Id. Instead, we must determine “whether the [CJommission acted in good faith based on the evidence before it.” Id.
¶ 20. We find that there was substantial evidence to support the Commission’s decision that the City terminated Renfro in good faith and for cause. Ren-fro was terminated for insubordination. Renfro vigorously argued that he acted according to standard operating procedures when he reported the misdemeanor drug transaction while he was off-duty. But Chief Davis did not seek to contact Renfro based solely on the fact that he had reported a crime while he was off-duty. The record indicates that Officer Guerrero, Lieutenant Ashley, and Corporal Shipman were all concerned that Renfro sounded intoxicated when he spoke over the radio. Chief Davis also testified that Renfro sounded intoxicated, and he had never had trouble understanding Renfro over the radio before. Officer Guerrero testified that Renfro’s voice sounded abnormal. Corporal Shipman testified that he had worked with Renfro for two years, and Renfro had never sounded that way before. Although Renfro submitted three unsworn statements that he was always difficult to understand over the radio because he tended *918 to mumble, we are not called upon to determine whether Renfro was actually intoxicated at the time he reported a crime while off-duty.
¶ 21. The fact remains that Chief Davis had substantial evidence to believe that Renfro was intoxicated. Not only that, Chief Davis had substantial evidence to believe that while Renfro was intoxicated, he drove to Moss Point and initiated some form of surveillance or investigation while he was off-duty. And while Renfro argues that it was standard operating procedure to report any crimes he witnessed while off-duty, there is a significant difference between simply encountering a crime while off-duty, and conducting unsanctioned surveillance while under the influence of alcohol in the hopes of witnessing a crime. Suffice it to say, Chief Davis had substantial evidence to be concerned that Renfro had been conducting quasi-police investigations while off-duty and intoxicated.
¶ 22. Renfro is correct that there was no evidence that he was intoxicated on the night of June 16, 2011. However, the lack of evidence is based almost entirely on the fact that he avoided all of Chief Davis’s attempts to resolve the question. As mentioned previously, Renfro initially told Chief Davis that he was at his apartment. A short time later, two officers arrived at Renfro’s apartment at Chief Davis’s direction. Renfro did not open the door, and he would not answer his phone. Additionally, Renfro’s Ford F-250 pickup truck was parked nearby.
¶ 23. The next morning, two other officers were further unable to contact Ren-fro. Chief Davis also attempted to call Renfro, but he did not answer the phone. Nor would he answer his door for Chief Davis. Officers heard Renfro’s phone ringing inside of his apartment. It is possible that Renfro had actually been picked up by a friend in the short time since Chief Davis first called him and the officers arrived at his apartment. But a reasonable fact-finder could also conclude that Renfro avoided Chief Davis’s attempts to contact him, and his avoidance prevented Chief Davis from obtaining contemporaneous evidence to confirm that Renfro was intoxicated. Even so, Renfro was not terminated for being intoxicated. He was terminated for insubordination and conduct unbecoming of a police officer.
¶ 24. When Renfro finally reported to the police department as directed, he was argumentative and agitated. He initially refused to take a portable breath test at Officer Butler’s direction. Officer Butler was the internal affairs officer at the Moss Point Police Department. He had authority to investigate the conduct of other officers on Chief Davis’s behalf. Even when Officer Butler told Renfro that he had to take a portable breath test, Renfro said that if Chief Davis wanted one, he would have to personally administer it. Chief Davis testified that he had been dealing with Renfro and his unusual behavior for approximately ten hours. Chief Davis had reason to believe that Renfro had been avoiding his phone calls and officers that Chief Davis had sent to act on his behalf. Faced with Renfro’s argumentative and combative attitude, Chief Davis decided that enough was enough, so he suspended Renfro with pay. Renfro stormed out of the police station. Because Renfro had a blood-alcohol content of .75%, Chief Davis told Renfro that he should not drive home. Officer Butler observed that Renfro then “started to argue with Chief Davis,” and he “thought Renfro may attempt to strike Chief Davis.”
¶25. To summarize, Chief Davis had substantial reason to suspect that Renfro had been conducting quasi-police surveillance while off-duty and intoxicated. There was evidence that Renfro avoided *919 Chief Davis’s attempts to confirm his suspicion. Finally, there was evidence that Renfro was insubordinate in that he was argumentative, adversarial, and combative regarding Officer Butler’s attempts to administer a portable breath test and ask questions on Chief Davis’s behalf. It follows that there was substantial evidence to support the Commission’s decision. There is no merit to Renfro’s appeal.
¶ 26. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. In Garrity v. New Jersey, 385 U.S. 493, 494, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), police officers under investigation were told that they would be removed from office if they declined to answer potentially incriminating questions, and their answers could be used against them in a criminal prosecution. The United States Supreme Court held that statements given under such circumstances were involuntary and could not be used to convict the officers. Id. at 500, 87 S.Ct. 616.