# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CC-00050-COA

RONALD WEEKS                                                                 APPELLANT

v.

CITY OF BILOXI, MISSISSIPPI AND ITS CIVIL                         APPELLEES
SERVICE COMMISSION

DATE OF JUDGMENT:            12/10/2015
TRIAL JUDGE:                 HON. LAWRENCE PAUL BOURGEOIS JR.
COURT FROM WHICH APPEALED:   HARRISON COUNTY CIRCUIT COURT,
                             SECOND JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:     ANDREW AUSTIN CLARK
                             RUSSELL S. GILL
ATTORNEYS FOR APPELLEES:     GERALD HENRY BLESSEY
                             TERE R. STEEL
                             DANIELLE BREWER JONES
NATURE OF THE CASE:          CIVIL - STATE BOARDS AND AGENCIES
TRIAL COURT DISPOSITION:     AFFIRMED THE JUDGMENT OF THE
                             BILOXI CIVIL SERVICE COMMISSION
DISPOSITION:                 AFFIRMED: 05/23/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., CARLTON AND GREENLEE, JJ.

### GRIFFIS, P.J., FOR THE COURT:

¶1.     Ronald Weeks appeals his termination as a police officer for the City of Biloxi. The

Biloxi Civil Service Commission found that the City acted in good faith when it terminated

Weeks for cause. Weeks appealed the decision to the Harrison County Circuit Court, which

affirmed the Commission's judgment. It is from this judgment that Weeks now appeals. We

find no error and affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     Weeks was employed as a police officer with the City of Biloxi from April 29, 1991, until he was terminated on October 31, 2007.

¶3.     Weeks's termination stemmed from the events that occurred shortly after his shift began on June 6, 2007.  Immediately after the shift briefing, Weeks learned that his close friend had attempted suicide and was at Biloxi Regional Medical Center.  Lieutenant Andrew Balius and Sergeant Michael Brumley, the shift supervisors, gave Weeks permission to leave work and go check on his friend's condition.  While responding to an unrelated call at the hospital, Lt. Balius observed Weeks crying.

¶4.     While Weeks was at the hospital, the dispatch center received several calls for service.  Weeks was needed in his patrol area.   After Weeks remained at the hospital for approximately two hours, Sgt. Brumley radioed and asked him to return to work.  Weeks did not immediately return.  Instead, he remained at the hospital, where he met with medical staff and discussed possible commitment to a psychiatric institution.  Sgt. Brumley, the evening-shift patrol sergeant, went to the hospital and instructed Weeks to return to the police station immediately.

¶5.     Once he returned to the station, Sgt. Brumley met with Weeks to discuss the amount of time that Weeks had spent at the hospital.  Sgt. Brumley was alarmed by Weeks's behavior during the meeting.  He drafted a narrative of the encounter.  According to the narrative, Weeks had been visibly upset and emotional.  Sgt. Brumley characterized Weeks's behavior as an "emotional tirade," which he described as a range of mood swings that occurred in a short period of time.  At one point during the meeting, Weeks became angry and blamed the

doctors for his friend's bipolar diagnosis. Weeks also blamed a police investigator for his friend's suicide attempt.[1]

¶6.     Sgt. Brumley further noted that Weeks's demeanor changed from offensive to an aggressive body posture. He testified that Weeks's tone had been angry and escalated at times. He also testified that Weeks cried and used profanity when he discussed his anger toward a fellow officer. Sgt. Brumley noted Weeks's explanation that he had "white knight syndrome" and always wanted to help people.

¶7.     According to Sgt. Brumley, Weeks had been too emotionally distraught to return to work. He did not believe that Weeks could put his friend's suicide attempt aside and focus on the job as he patrolled the streets. Sgt. Brumley testified that he had never seen an officer behave so emotionally. The behavior caused Sgt. Brumley to question Weeks's fitness for duty. Sgt. Brumley was especially concerned that Weeks was not a relative, yet he discussed the patient's medical information. According to Sgt. Brumley, police officers are not permitted to discuss confidential information regarding patients. Sgt. Brumley was also alarmed that Weeks blamed the police department's investigation for his friend's suicide attempt. Sgt. Brumley testified that he felt that Weeks's relationship with his friend coupled with his mental state could cause a liability issue for the City. As a result of Sgt. Brumley's concerns, Weeks was sent home for the remainder of the day and instructed not to return to the hospital in his uniform. Sgt. Brumley's documentation was forwarded up the chain of

[1] Notably, Weeks's friend was the subject of an ongoing criminal investigation where she had been accused of stabbing her husband, a City of Biloxi firefighter, during an argument.

command.

¶8. Assistant Chief Rodney McGilvary and the director of the Biloxi Police Department, Bruce Dunagan, received the documentation. Asst. Chief McGilvary and Director Dunagan conducted a review of Weeks's personnel file. They determined that Weeks's recent behavior, coupled with numerous complaints made against him, raised "red flags." The personnel file contained at least five complaints made against Weeks between November 1996 and April 2007. In each instance Weeks had been accused of exhibiting poor judgment when dealing with women. For his behavior, Weeks had received disciplinary actions including verbal counseling, three no-contact orders against him, a five-day suspension, and demotion from sergeant to patrol.

¶9. Asst. Chief McGilvary testified that all of the complaints against Weeks had been made by women. He also testified that a prior fitness-for-duty evaluation indicated that Weeks had moved from a low risk to a moderate risk for possible employment problems. The previous evaluation also concluded that without intervention Weeks would likely advance to a high-risk classification.

¶10. Asst. Chief McGilvary and Director Dunagan then found it necessary to request a psychological evaluation to ascertain Weeks's continued fitness for duty. Director Dunagan consulted human resources for assistance with the matter. Director Dunagan testified that he met with Biloxi Mayor A.J. Holloway and briefed him about Weeks's situation. Mayor Holloway approved Director Dunagan's request to send Weeks for a fitness-for-duty examination.

¶11. Weeks was notified that he would undergo a fitness-for-duty exam on June 12, 2007. Dr. Julie Teaters, clinical psychologist, concluded that Weeks was unfit for duty as a police officer. The psychological-fitness-for-duty report provided:

> Mr. Weeks appears to have a behavior pattern that involves his actions with women at work as well as away from work. The recent incident in April suggests that he has not changed his behavior toward women that was noted in previous complaints. His actions in June also raise concerns that he violated a hospital patient's privacy regarding the status of her health. Both of the incidents suggest the abuse of his position of power as a police officer. . . . Mr. Weeks does appear to have a continuing problem with his judgment. It is reasonable that this problem will continue to lead to his inability to perform his essential job functions. Based on his long history of poor judgment (particularly involving women) it is felt that Mr. Weeks is NOT FIT FOR DUTY. Due to the lengthy history of repeated poor judgment it is felt that further efforts to correct his problem are likely to be ineffective.

¶12. In a letter, dated June 19, 2007, Director Dunagan informed Weeks that Dr. Teater found him unfit for duty. Consequently, Weeks remained on paid administrative leave from work. Director Dunagan requested that Weeks provide Dr. Teater with psychological and/or psychiatric records from his primary treatment provider. In response to this request, Weeks's primary-care physician, Dr. W.R. Fellows, submitted a letter to human resources. Dr. Fellows noted that Weeks's medical problems had been treated with medication and were under control. Dr. Fellows further opined that nothing in the health of Weeks prevented him from fulfilling his duties as a Biloxi police officer.

¶13. After a review of Dr. Fellows's records, Dr. Teater made no changes to her previous recommendation. In an addendum, Dr. Teater opined that Weeks appeared to have a continuing problem with his judgment, which she predicted would lead to an inability to perform his essential job functions. Due to the conflict of the two opinions, Mayor Holloway

5

requested a third opinion. Weeks was sent to Dr. Mark Webb for a second fitness-for-duty exam. On August 16, 2007, Dr. Webb concluded that Weeks suffered from dysthymia[2] and dependent-personality traits. In his report, Dr. Webb provided the following:

> [W]eeks could definitely benefit from psychotherapy on a long-term basis to help with these traits. He has a lot of issues to work through. With Mr. Weeks's dysthymia and dependent personality traits, he is not fit for duty. These illnesses in a person of significant power are a very lethal combination which has been borne out in multiple incidences during Mr. Weeks's career as a police officer.

¶14.    After he was declared unfit for duty by both a psychologist and a psychiatrist, Director Dunagan recommended Weeks's termination. Weeks was informed that the final decision to terminate would be made by the mayor. He was also informed that he would have an opportunity to go before the mayor and respond to the recommendation for termination. Two days before the scheduled meeting, Weeks requested copies of the psychological reports of Dr. Teater and Dr. Webb.

¶15.    On September 25, 2007, Weeks met with Mayor Holloway and submitted a written response to Director Dunagan's recommendation for termination. At that time, Weeks requested  additional time to obtain an independent psychological evaluation. Mayor Holloway granted Weeks's request and gave him until October 15, 2007, to submit an independent psychological evaluation on his fitness for duty. On October 8, 2007, Mayor Holloway informed Weeks that he would be permitted to read and review Dr. Teater's and Dr. Webb's psychological evaluations. On October 9, 2007, Weeks visited Director Dunagan's office, where he reviewed the reports and took notes. Weeks was not given

---

[2] Dr. Webb defined dysthymia as a low grade, nondisabling form of depression.

copies of the reports at that time. On October 11, 2007, Weeks submitted a letter to Mayor Holloway and informed him that he had difficulty finding a doctor to reevaluate his fitness for duty because he did not have copies of the reports drafted by Drs. Teater and Webb. Once again, Weeks requested additional time to obtain an independent psychological evaluation. Weeks did not submit any additional documentation before the October 15, 2007 deadline.

¶16. In a hand-delivered letter, dated October 19, 2007, Mayor Holloway refused Weeks's request for additional time to obtain another evaluation. Mayor Holloway noted that Weeks had been given ample time, since June 19, 2007, to obtain a diagnosis from a mental health provider of his choice. Weeks was further informed that his employment with the City was terminated, effective October 31, 2007. Weeks was notified that his suitability for employment had been evaluated under section 5.12(b) of the City's rules and regulations. Section 5.12(b) provided:

> An individual entering the classified service may be required to receive a satisfactory health exam report before the candidates's appointment can be made. The [a]ppointing [a]uthority may require any member to meet the same requirements when there are reasonable grounds to question said employee regarding the candidate's mental and physical suitability for continued employment . . . .

Mayor Holloway noted that the decision had been reached after both a psychologist and a psychiatrist opined that Weeks was unfit for duty. Weeks was further advised that he had ten days to request that the Commission review the City's decision.

¶17. Weeks timely appealed the City's decision to the Commission. An appeal hearing was scheduled for July 29, 2008. Prior to the hearing, Weeks obtained an independent

7

psychological evaluation from Dr. William Gasparrini, a clinical psychologist. Weeks submitted two separate copies of Dr. Gasparrini's report to the Commission. The first report, labeled "Gasparrini-2," was submitted prior to the deadline for submission of exhibits on July 22, 2008.

¶18. At Weeks's request, the hearing was continued to October 20, 2008. The parties were given a new deadline in which to submit additional exhibits for review by the Commission. In response to the new deadline, Weeks's attorney removed the first report, labeled Gasparrini-2, from his exhibits and replaced it with a second report, labeled "Gasparrini-1." The City then submitted the retracted report as one of its own exhibits.

¶19. Weeks's appeal hearing was continued on four separate occasions. On March 26, 2009, the initial hearing convened but was postponed, yet again, after the parties agreed to stay the appeal while Weeks pursued a claim for medical-disability retirement benefits through the Public Employees' Retirement System of Mississippi (PERS). Approximately three years later, Weeks notified the Commission that his request for PERS disability benefits had been denied. On August 9, 2012, Weeks requested that his appeal hearing be rescheduled. The appeal hearing was rescheduled.

¶20. After a four-day hearing, the Commission issued its findings of fact and conclusions of law on September 12, 2013. The Commission found that the evidence presented at the hearing was sufficient to establish reasonable grounds to recommend Weeks for a fitness-for-duty exam. The Commission concluded that no credible evidence was presented to show that the decision to send Weeks for a fitness-for-duty evaluation was ordered as a pretext or was

8

politically motivated. The Commission further found that the City had good cause to terminate Weeks's employment.

¶21. Aggrieved by the Commission's decision, Weeks filed a notice of appeal to the circuit court. On December 10, 2015, the circuit-court judge affirmed the Commission's decision favoring the City's termination of Weeks. The circuit-court judge found that the Commission's decision was made in good faith for cause. The circuit-court judge further found that the Commission's findings were supported by substantial evidence, and therefore, were not arbitrary or capricious. Aggrieved by the circuit court's judgment, Weeks now appeals to this Court.

STANDARD OF REVIEW

¶22. This Court employs a limited standard of review. In an appeal from a civil service commission's decision, our standard of review is as follows:

> [T]he question before the appellate court is whether or not the action of the Civil Service Commission was in good faith for cause. Intertwined with this question is whether or not there was substantial evidence before the Civil Service Commission to support its order and whether [the decision] is arbitrary, unreasonable, confiscatory, and capricious.

*Necaise v. City of Waveland*, 170 So. 3d 616, 618 (¶9) (Miss. Ct. App. 2015) (citations omitted).

¶23. "We are prohibited from substituting our judgment for the City's." *Renfro v. City of Moss Point*, 156 So. 3d 913, 917 (¶19) (Miss. Ct. App. 2014). Further, this Court is "prohibited from making credibility determinations of the evidence or testimony that was presented to the . . . [C]ommission." *Id.* (citation omitted). As an appellate court, we "[are]

9

not called upon to determine issues of fact regarding whether an employee actually committed the alleged misconduct that led to his . . . termination." *Id.* Rather, we are charged only with determining "whether the [C]ommission acted in good faith based on the evidence before it." *Id.*

## ANALYSIS

### I. Fitness-for-Duty Exam

¶24. Weeks first claims that the Commission's finding that the City had reasonable grounds to require a fitness-for-duty exam was unsupported by substantial evidence. According to Weeks, the City had no reasonable grounds to question his fitness for duty on June 6, 2007. He argues that the City acted inappropriately when it considered his personnel file in reaching a decision to order the fitness-for-duty exam. He further contends that there was not substantial evidence to support the City's justification that a fitness-for-duty exam was necessary because Weeks posed a potential liability to the City.

¶25. We find there was substantial evidence to support the Commission's finding that the City had reasonable grounds to request that Weeks undergo a fitness-for-duty exam. Weeks argued that he broke no rules when he visited his friend in the hospital. However, the hospital visitation alone did not cause Asst. Chief McGilvary and Director Dunagan to conclude that a fitness-for-duty exam was necessary. The record indicates that Sgt. Brumley, Asst. Chief McGilvary, and Director Dunagan were all concerned that Weeks's emotional behavior on June 6, 2007, was unusual for a police officer. The record further indicates that Weeks was overly emotional, irate, and angry toward fellow officers, and accusatory of the

police department for a suspect's suicide attempt.

¶26. The decision to send Weeks for a psychological evaluation was not made without consideration. Director Dunagan testified that he and Asst. Chief McGilvary were concerned that Weeks was unfit for duty. As a result of this concern, Director Dunagan testified that he followed standard procedure and conducted a full review of Weeks's personnel file before making any further decisions. Director Dunagan further testified that Weeks's personnel file contained numerous prior incidents in which Weeks had displayed poor judgment with regard to women. Weeks's behavior toward the female friend on June 6, 2007, while on duty, indicated a continuation in the pattern of poor judgment.

¶27. Further, Weeks's personnel file contained a prior fitness-for-duty evaluation, wherein a psychologist concluded that Weeks had advanced from a low to a moderate risk for employment problems. In the prior evaluation, the psychologist had predicted that, without intervention, Weeks would become a high risk for employment problems. Both Director Dunagan and Asst. Chief McGilvary testified that Weeks's behavior, coupled with his prior history of poor judgment and the potential liability to the City, constituted reasonable grounds to send Weeks for a fitness-for-duty exam.

¶28. Director Dunagan testified that he consulted the City's human-resources department prior to taking any action. He then proceeded with disciplinary action under section 5.12(b), which required that the City's appointing authority request the mental evaluation. Mayor Holloway testifed that he met with Director Dunagan and received information regarding the situation. Mayor Holloway further testified that he, as the appointing authority, authorized

11

the fitness-for-duty examination of Weeks to determine Weeks's mental suitability for continued employment.

¶29. Mayor Holloway had reason to believe that Weeks's emotional state had compromised his ability to perform his duties as a patrolman. A review of the personnel file indicated that Weeks had a history of poor judgment and prior psychological indicators that could jeopardize the City. By authorizing the fitness-for-duty exam, Mayor Holloway acted in the best interest of both the public and the City. Thus, Mayor Holloway had reasonable grounds to question Weeks's mental suitability for continued employment and to authorize the fitness-for-duty exam.

*II. Due Process*

¶30. Weeks next argues that the Commission erred when it determined that the City acted in good faith and followed the correct procedures under section 5.12(b). Weeks contends that he was given limited or no due process under section 5.12(b). He contends that the Commission analyzed his due-process argument under the incorrect standard. He asserts that his argument should have been assessed under "disciplinary actions" rather than "mental evaluations."

¶31. Director Dunagan testified that no disciplinary action was initiated under article 10 of the Civil Service Rules and Regulations because Weeks's employment action was not disciplinary in nature; rather, it was medical and governed by section 5.12(b). The Commission found that the Civil Service Rules and Regulations allow an agency's chain of command to decide the appropriate type of action in employment cases. Here, the City

possessed the power to pursue a disciplinary action, or if reasonable grounds existed, to send Officer Weeks for a fitness-for-duty exam. Director Dunagan testified that Weeks's emotional state raised concerns regarding his mental suitability for continued employment. Therefore, the City elected to pursue action under section 5.12(b), which governed medical requirements.

¶32. Weeks asserts that the Commission misunderstood his position when it found that the City followed the correct procedures required by section 5.12(b). He contends that section 5.12(b) had less-stringent termination rules than article 10, which prevented him from receiving a good-faith pretermination hearing. This is a mischaracterization of the Commission's findings. The Commission noted that the City had discretion to determine which route it would pursue regarding the employment action. The Commission further noted its obligation to abide by the Civil Service Rules and Regulations, which prohibits a reviewing body from substituting its own judgment for the City's judgment.

¶33. Further, the Commission considered Weeks's argument that he had been denied due process under the disciplinary process outlined in Mississippi Code Annotated section 21-31-23 (Rev. 2015). The Commission established that each element of due process was met. First, Weeks was given written notice of the intended termination, reasons for the termination, and an opportunity to respond. In a meeting with Mayor Holloway, Weeks did in fact respond to Director Dunagan's recommendation for termination. Thus, the first element of due process was met. Second, Weeks was notified, in writing, by the official charged with making the decision. After the meeting with Mayor Holloway, Weeks was

13

notified of his termination in a letter dated October 9, 2007. This satisfied the second element of due process. Last, Weeks was allowed to file an appeal with the Commission after the disciplinary action was taken. Both Director Dunagan and Mayor Holloway sent letters informing Weeks that he had ten days, from the date of the Mayor's decision, to request an investigation by the Commission. Weeks did in fact file a notice of appeal with the Commission on October 25, 2007. Accordingly, the final element of due process was met. The Commission's finding that the City acted in good faith and provided Weeks with due process was supported by substantial evidence.

### III. Psychological Evaluations

¶34. Weeks next argues that the Commission's determination that he failed to provide a sufficient mental evaluation was not supported by substantial evidence. He contends that the Commission erred when it found that the City correctly relied on the opinions of Drs. Teater and Webb. He further contends that the Commission disregarded Dr. Fellows's letter and clinical psychologist Dr. Stefan Massong's testimony, which deemed him fit for duty. Weeks also argues that the City denied him access to the psychological evaluations that it relied on when making the decision to terminate him.

¶35. Weeks argues that the Commission overlooked Dr. Fellows's opinion that "nothing in the health of Officer Weeks . . . would prevent his fulfilling his duties as a Biloxi Police Officer." However, the fact remains that Mayor Holloway only requested a third opinion after Dr. Teater, a psychologist, and Dr. Fellows, Weeks's primary-care physician, submitted conflicting opinions. The third opinion, submitted by Dr. Webb, was in line with Dr.

14

Teater's opinion that Weeks was unfit for duty. Thus, the Commission's finding that the medical opinions of Drs. Teater and Webb were the only two available to Mayor Holloway when he made his decision, was supported by substantial evidence.

¶36. Of the three opinions available to Mayor Holloway at the time of his decision, only one found Weeks fit for duty. Mayor Holloway, in his letter of termination, informed Weeks that the termination was based on the opinions of a psychologist and a psychiatrist. Further, Weeks had been given more than four months to obtain his own psychological evaluation regarding his fitness for duty. In that time frame, Weeks had only provided a two-sentence letter from his primary-care physician. Thus, at the time of his decision, Mayor Holloway had no other psychological evaluations to rely upon while considering Weeks's termination.

¶37. Weeks did finally obtain his own psychological evaluation. However, the Commission determined that Dr. Gasparrini's report, dated February 20, 2008, confirmed Drs. Teater and Webb's earlier opinions. Dr. Gasparrini opined that Weeks was unfit to perform his job as a police officer unless and until he completed psychological counseling to develop boundaries between his personal and professional life.

¶38. Dr. Gasparrini passed away prior to the appeal hearing. Weeks was permitted to obtain another expert to testify at the hearing. At the hearing, Dr. Massong, clinical psychologist, opined that Weeks was fit for duty at the time of Dr. Gasparrini's evaluation, which was performed four months after Weeks's termination. The Commission recognized Dr. Massong's report and opinion. However, the Commission found that Dr. Massong's January 30, 2013 report and opinion were not available to Mayor Holloway in 2007. Dr.

15

Massong could not state, with certainty, that his evaluation of Weeks would have been the same if the evaluation had been performed five years earlier, in 2007.

¶39.    The Commission found that the relevant point for an inquiry into whether or not Weeks was fit for duty was in 2007, when the termination decision was made. Based on the record, the Commission determined that Weeks was terminated because both a psychologist and a psychiatrist found him unfit for duty. The Commission's finding that the City acted in good faith when it terminated Weeks for cause was supported by substantial evidence.

*IV.    Irrelevant Evidence*

¶40.    Finally, Weeks claims that the Commission relied on irrelevant evidence to affirm the termination. He argues that the Commission erroneously admitted both a draft and final version of Dr. Gasparrini's psychological evaluation. He further contends that the Commission mischaracterized Dr. Gasparrini's findings.

¶41.    Prior to the appeal hearing, Weeks submitted Dr. Gasparrini's report as one of his exhibits. After the hearing was postponed, the Commission set a new deadline for the submission of exhibits. In response to the new deadline, Weeks removed the initial report, labeled Gasparrini-2, and replaced it with a second report, labeled Gasparrini-1. The City then submitted Gasparrini-2 as its own exhibit. Weeks claimed that Gasparrini-2 was a draft report that was inadvertently placed with the exhibits filed with the Commission.

¶42.    In response to Weeks's challenge to the City's use of the retracted psychological evaluation, the Commission first noted that there was no indication that the report, labeled Gasparrini-2, was intended as a "draft." The report contained no such language and did not

16

bear a "draft" stamp. Further, the report was typed on letterhead and signed by Dr. Gasparrini. The Commission also found that the City had not acted improperly by obtaining the information contained within the report. Therefore, the Commission found that the City was free to refer to the report as evidence. The Commission noted that it was Weeks's own counsel that had submitted both of the reports, and accordingly, it would consider both reports.

¶43. The Commission further noted that the content of Dr. Gasparrini's two reports was identical until the last page. The final page of Gasparrini-2 contained the following language, which was not contained in the report labeled Gasparrini-1:

> [C]onfusing the power dynamics of his role as a uniformed police officer on duty with his dating relationships has repeatedly led to difficulties for him in his career. These should be addressed through further counseling before he tries to resume work as a police officer or in a similar position. At present Mr. Weeks is highly motivated to return to work for the police department. He is hopeful that he can win his case in court and regain his job. He may be capable of working successfully as a police officer if he carefully separates his work roles from his social life.

¶44. We find that the Commission's decision to consider both versions of Dr. Gasparrini's reports was based on substantial evidence. Weeks provided no testimony or evidence to support his claim that the report, labeled Gasparrini-2, was intended as a draft version of a final report.

¶45. To summarize, Weeks was observed behaving in a manner inconsistent with the type of behavior expected of a trained police officer. After reviewing Sgt. Brumley's narrative and Weeks's personnel file, Director Dunagan had reasonable grounds to question Weeks's mental state. Director Dunagan followed the City's rules and regulations by referring the

17

matter to human resources and Mayor Holloway. Mayor Holloway, as the appointing authority, ordered a fitness-for-duty examination. After the findings of a psychologist and a psychiatrist, Weeks was terminated and given an opportunity to appeal the City's decision. It follows that there was substantial evidence to support the Commission's decision. Weeks's claim to the contrary is without merit.

¶46. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING, P.J., BARNES, ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**