# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CC-00454-COA

**RAKASHA ADAMS**                                                             **APPELLANT**

**v.**

**CITY OF JACKSON, MISSISSIPPI**                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2021 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | MICHAEL VERDIER CORY JR. |
| ATTORNEY FOR APPELLEE: | CARRIE JOHNSON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND REMANDED - 05/09/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Rakasha Adams was an officer with the Jackson Police Department. During one shift, after witnessing a vehicle run a stop sign and force another vehicle off the road, Officer Adams initiated blue lights to conduct a traffic stop. The vehicle did not immediately stop. Officer Adams followed behind the vehicle for 1.23 miles for approximately four minutes, traveling between ten and twenty miles per hour. The vehicle eventually ran into another patrol vehicle assisting Officer Adams. After the officers exited their vehicles, the driver attempted to strike the assisting officer. As a result, both officers fired their weapons at the car, and the driver was killed. Jackson Police Department suspended both officers for ninety-days without pay for engaging in a "pursuit" while Jackson had a "no-pursuit policy."

Adams appealed to the Civil Service Commission, and after a hearing, the Commission affirmed the suspension. After the circuit court affirmed the Commission's decision, Officer Adams appealed and alleges before this Court that the Commission's decision was made without substantial evidence and was arbitrary and capricious. We agree that the Commission's decision was contrary to the substantial evidence, arbitrary, and capricious, and we reverse the circuit court's judgment confirming that decision. We remand the case to the Commission for a determination of restitution consistent with this opinion.

**PROCEDURAL HISTORY AND FACTS**

¶2.     On January 27, 2018, Adams saw a red Pontiac G6 run a stop sign and cause a black Nissan to run off the road while she was on patrol in a residential area in Jackson. After checking on the individuals in the Nissan and ensuring their safety, she turned on her blue lights and followed the red Pontiac to initiate a traffic stop. The Pontiac driver did not pull over but continued to drive at a slow speed between ten and twenty miles per hour for approximately four minutes or 1.23 miles. During that time, Adams radioed dispatch to run the Pontiac tag and discovered the Pontiac had not been stolen and belonged to Crystalline Barnes. Adams also radioed Corporal Albert Taylor,[1] who was on patrol nearby, and asked him to "assist" her with "pulling over the car." Taylor assisted and positioned his patrol car behind Adams and began to follow Adams. At some point as they approached a traffic light,

---

[1] Corporal Taylor was the co-appellant before the Jackson Civil Service Commission and another Jackson City Police officer who attempted to assist Adams.

Taylor was separated from Adams and the Pontiac. Adams and the Pontiac made it through the intersection on the green light, but it changed to red for Taylor. He stopped at the light and waited for the light to turn green again. Once the traffic light changed to green, Taylor continued and found Adams and the Pontiac at the end of a residential street. The Pontiac accelerated and ran into Taylor's patrol car head-on. Both Adams and Taylor got out of their patrol cars and saw the Pontiac accelerate again, but this time it went toward Taylor in what both officers thought was an attempt to run Taylor over. In response, Adams and Taylor fired their weapons at the Pontiac. The Pontiac's driver, Barnes, was killed. A Hinds County grand jury returned a no true bill as to the officers' actions during the shooting. However, the Jackson Police Department concluded Adams (and Taylor) violated the Jackson Police Department's "no-pursuit policy" and suspended both officers for ninety days without pay. Adams appealed the disciplinary action to the City of Jackson's Civil Service Commission (Commission),[2] and on February 14, 2019, the Commission held a hearing.

¶3. During the Commission hearing, Adams was the first to testify. She testified that she started her patrol shift around 6:45 a.m. or 7:00 a.m., and around 7:20 a.m. she "saw the red Pontiac G6 [make a wide turn and] run the stop sign[,] . . . [which ran a black] Nissan off the roadway . . . onto the grass and onto the curb." Adams checked on the occupants of the Nissan, and both occupants said they were okay and asked her "to go get the people that were

---

[2] The record does not provide the date that Adams filed her request for a hearing to appeal her suspension. The record states only that her request was timely filed.

driving carelessly." Adams said that she reversed her patrol car to follow the Pontiac, but by the time she got to the road, the Pontiac was already at the end of the road. She then initiated her blue lights, but the Pontiac did not stop. Instead, "the car [made] a rolling stop at the stop sign and turn[ed] and [made] a left-hand turn." Adams explained that she was unable to see the Pontiac driver because of the dark tint, and she "called out" to dispatch to "run a tag." Adams said that Sergeant Geraldine Green intervened and asked her "what I have" and "what's [my] speed." Adams said she explained what happened and when she told Green her speed, fifteen to twenty miles per hour , Green became "silent."[3] Dispatch ran the tag and told Adams that Crystalline Barnes was the owner of the Pontiac and the car had not been stolen. Adams said the Pontiac made one left-hand turn during this exchange.

¶4.     Adams also testified that she radioed Corporal Taylor and asked him to help her conduct a traffic stop of the Pontiac. She said Taylor followed behind her, but they were separated when Taylor stopped at a red traffic light. Adams said the Pontiac started to weave, "[and] I'm thinking . . . maybe this is someone in the car that's . . . intoxicated or maybe sick or whatever, so I'm still following the vehicle." She said she was assessing the scene:

> [T]he car was driving in a careless manner and traveling at low speed; and the car started to weave over the roadway. So I don't know what is wrong with this driver[,] . . . [but I'm] making a routine traffic stop.

¶5.     Adams also testified that she was not involved in a pursuit because she was not

---

[3] By "silent," Officer Adams meant no further radio traffic.

attempting to make an arrest or apprehend a suspect. She stated, "just because I was trying to pull the car over, that doesn't mean that I was trying to apprehend anyone or take her to jail." Adams further explained she could have "given [the driver] a talk or wrote a ticket" because it was a routine traffic stop for careless driving. Specifically, the following exchange occurred during Adams's examination:

> CORY:[4]  If we keep looking at this, it talks about the vehicle pursuit, the officers attempting to apprehend the suspect, and then it goes on to say who is trying to avoid arrest by driving a motor vehicle. Did you at any point think that the driver of the red Pontiac was trying to avoid arrest?
>
> ADAMS:  No, sir.
>
> CORY:  Why not? What are the things you are thinking, again?
>
> ADAMS:  When I see somebody trying to avoid arrest, I think of somebody intentionally speeding away from me or running away from me, fighting me, doing something in a violent manner to get away from me.
>
> . . . .
>
> COMMISSIONER
> ESTER STOKES
> (STOKES):  [T]ell this Commission what had you planned to do.
>
> ADAMS:  I mean, when you are doing a traffic stop, right, when you're doing a traffic, does every car you pull over you take to jail?
>
> STOKES:  You know that ain't the truth.
>
> ADAMS:  Exactly.
>
> STOKES:  Right. What are you saying as it relates to your case?
>
> ADAMS:  As it relates to my case, I do traffic stops all the time. I write more tickets than I do anything.

¶6.  Adams also acknowledged knowing the "no-pursuit policy," which was admitted into

---

[4] Michael Cory was Adams's attorney.

5

evidence. She admitted that Jackson Police Department (JPD) policies define a "Vehicular Pursuit" as

> [a]n event involving one or more law enforcement officers attempting to apprehend a suspect who is trying to avoid arrest by driving a motor vehicle. In this attempt to avoid arrest, the suspect may drive at high speeds or may attempt other evasive driving actions. The suspect may also simply drive in a legal manner, but fail to yield or stop for an officer's emergency lights and sirens.

¶7. Adams testified it is understood among officers that some civilians will not immediately stop for blue lights but travel to an area where they feel safe before stopping. She stated,

> They may not feel safe at that time. They may be going to their house to park their vehicle because they don't want their vehicle towed. . . . There are plenty of reasons. If you are working on the night shift, it may be too dark in that area, and they may be going to a store. There are plenty of reasons that a car is not going to stop as soon as you flip your blue lights.

Adams also said the Pontiac's behavior was not evasive even though the driver did not immediately stop. She testified the time between the moment she initiated the blue lights and the moment the Pontiac stopped was about four minutes (1.23 miles). She further stated the entire distance of 1.23 miles was traveled at low speeds between ten and twenty miles per hour. Adams further explained the driver could have been experiencing a diabetic situation, and "when drivers are like that, they don't know that a vehicle is behind them." Adams said JPD does not allow officers "to call an ambulance until we actually know . . . the situation that we have." She also stated that JPD did not provide any training or detail regarding how long an officer should flash the blue lights before terminating a traffic stop if the driver does

6

not stop. She explained that based on her training and reading and understanding of the policy, the officers must "assess the situation" and make a "judgment call" to determine when a routine traffic stop escalates to a pursuit.

¶8. Finally, Adams testified that her ninety-day suspension was excessive compared to other known pursuits. She explained that JPD failed to punish the following two alleged "pursuit" violations that occurred on November 15, 2017, and February 2, 2017.[5]

**November 15, 2017**

¶9. Regarding the November 15, 2017 incident, Adams testified that the Delta unit was administering a checkpoint when a vehicle went through it, and an officer pursued the vehicle and eventually started chasing the suspect. Adams said,

> An **officer pursued the vehicle and then jumped out and started running after the suspect after a chase in the car with the vehicle**. The officer then **went on a short foot pursuit of the suspect, and then after that he fired at the suspect, shooting the suspect in the leg**. The suspect did a couple of days in the hospital. The officer was on **administrative leave with pay**, and after that he was cleared, **no disciplinary action**.

(Emphasis added). Adams also explained that the pursuit occurred in a residential area above the lawful speed limits. According to Adams, the vehicles were traveling forty and fifty miles per hour.

**February 2, 2017**

---

[5] Adams's counsel sent a Freedom of Information Act request to JPD, requesting pursuits within the last ten years where discipline was imposed. JPD returned three different files dated October 6, 2014; May 12, 2012; and June 4, 2016. These three incidents did involve some type of punishment for a pursuit violation.

¶10. Adams said another incident occurred on February 2, 2017. She explained that she was stationed at the precinct when she heard the following pursuit over the radio:

> [F]our teens, robbed a man on Chickasaw Avenue while he was walking his dog, and **they got away with it.** They were in a red Camry. [JPD] had no knowledge where [they were]. Later on . . . someone called a JPD officer and said [the red Camry] was in that neighborhood. The JPD officer saw the car [and] he got behind the car. The car began to flee, and he started telling dispatch where he was. And then it began into a high speed chase. [**The teens] were not robbing anybody at the time**, but **it started in a high speed chase**, and **it went into several precincts**, and the **teens ended up crashing the car**. **No disciplinary punishment**.

(Emphasis added).

¶11. The next witness called was Corporal Taylor, who testified that he did not believe Adams's (and his actions) constituted a "pursuit" for three reasons. First, Adams and the Pontiac were traveling at low speeds (between ten and twenty miles per hour). Second, Adams used only her blue lights and did not use her siren. Third, the driver of the Pontiac did not demonstrate any evasive behavior but only seemed to drive in a careless manner.[6] Taylor also explained the events leading to the discharge of his weapon. He said that Adams radioed him and asked for his help to pull over the Pontiac and that he did not respond on the radio because he saw Adams and the Pontiac drive past his "beat." He also stated that he did not perceive any urgency when Adams radioed for assistance because the Pontiac was

---

[6] Taylor also testified that as a ranking officer, he had the authority to tell officers to terminate any pursuit. Therefore, if he perceived Adams's actions to have constituted a pursuit, he could have ordered her to terminate it. But he did not perceive her actions as a pursuit; therefore, he did not tell her to terminate it or radio dispatch.

8

traveling at "low speeds."

¶12.    Taylor also testified that he lost sight of Adams and the Pontiac when he stopped at a red light.  He explained that Adams and the Pontiac made the green light, but the light changed to red; therefore, he stopped.  Taylor said that he was headed back to his "beat" when he saw what appeared to be Adams and the Pontiac at the opposite end of a road.  He testified that he was not expecting to see Adams or the Pontiac and was surprised when the Pontiac accelerated toward his patrol car.  Finally, Taylor testified that the suspension without pay was excessive and that there were other actual high-speed pursuits that did not result in any disciplinary actions by the City.

¶13.    Chief Mark Dunston was the last witness called by Adams's counsel.[7]  Chief Dunston has served as a law enforcement officer for thirty-five years.  He explained that he worked as an instructor at the Mississippi Law Enforcement Officers Training Academy and has served as a director at the North Mississippi Law Enforcement Training Center in Tupelo and the Mississippi Police Corps at the University of Southern Mississippi.  Chief Dunston said

---

[7] Chief Dunston was offered as an expert in "law enforcement and specifically with respect to pursuit policies."  The City did not object to the qualifications for the tendering of Chief Dunston as an expert.  The City objected to relevance.  The City's attorney said, "[T]here were two things that Attorney Cory laid out initially as the reason for the hearing: One, that this wasn't a pursuit; and two, that if it was a pursuit, that the punishment didn't fit the particular charge. His testimony is irrelevant to the two reasons . . . ."  The Commission sustained the objection but nevertheless  allowed Adams's attorney to ask questions about the pursuit.  Commissioner Stokes said, "We are going to sustain the objection, because [sic] it's going to depend who our experts are supposed to be and how they interpret it.  If you have a couple of questions for him, that's fine."

9

that he would not classify Adams's actions as a pursuit. Chief Dunston explained,

> Given the description of the officers' actions in this particular incident, this would be described in one of my classes in training as not a pursuit. . . . [T]here are no definitive actions by the driver of the red car that would indicate to an officer, given those scenario criteria, that the person was attempting to evade the police. This was quite consistent with what I've instructed in pursuit management and pursuit policy classes on an officer attempting to stop somebody who has an unknown problem going on. . . .

¶14. The following exchange also occurred between Commissioner Stokes and Chief Dunston.

> STOKES: And you don't call this a pursuit? At what point would you have called it -- I mean, here's somebody who has ran into an officer's car. You're the expert. At what point would you call that a pursuit?
>
> DUNSTON: Yes, ma'am. That was the very first evasive action that the young lady took was when she ran into the officer's car. Then if she took off from there, that would have been a pursuit chase, because up until that point there were no evasive actions.

He elaborated that he has taught between 300 and 400 law enforcement executives. In addition, Chief Dunston explained an officer has to use discretion and judgment in determining when a traffic stop turns into a pursuit. He stated, "[T]o make the decision whether or not it's just a traffic stop or it's a pursuit, we have to rely quite a bit on our officers to be able to make those decisions because we are not there with them all the time."

¶15. The City's only witness was Sergeant Geraldine Green, the supervising officer on the day of the alleged pursuit. Green testified that she was in the office completing paperwork when she overheard Adams request to "run a tag" and thought Adams's request curious

10

because of the inclement weather. Green explained that she then intervened and "keyed up," and the following exchange occurred between her and Adams:

> GREEN: What do you have, and what is your location?
> ADAMS: I'm on Parkway approaching Avenue H, and there was a red car that almost ran someone off the road.
> GREEN: Well, did you go back and check on the people that were ran off the road?
> ADAMS: 10-4. They were okay.
> GREEN: Were you able to get a tag?
> ADAMS: 10-4 (and ADAMS cited the tag).

¶16. Green also testified that the next time Adams "keyed up" was to request dispatch to send the Jackson Fire Department because a car was on fire. She testified the duration of time between the previous exchange and Adams's request for fire assistance was two seconds. Specifically,

> SPRINGER:[8] So the next traffic that you heard relating to her was when she called for the fire department?
> GREEN: Yes.
> SPRINGER: Do you know how long that was in between?
> GREEN: Maybe two seconds.
> SPRINGER: Two seconds?
> GREEN: Immediately when she cited the tag, she keyed up immediately, and then she asked dispatch to send JFD to Fernwood and Overstreet. She said she had a vehicle that was on fire.

Green said that neither officer told her that he or she was still following the Pontiac. She explained that at no point was there a felony involved, and "the incident was simply a traffic violation of a reckless driver." She also testified that Adams should have terminated the stop

---

[8] Francis Springer was Corporal Taylor's attorney.

immediately after flashing her blue lights and the Pontiac refused to stop because JPD has a no-pursuit policy. Meaning, the police can only pursue those suspected of committing a crime of violence. However, Green could not provide a clear explanation to the Commission's question regarding when a traffic stop escalates to a pursuit. Green also stated that Adams should have terminated the stop once she got the tag number because the benefit of apprehension did *not* outweigh the risk of injury or death.

¶17. On May 20, 2019, the Commission issued an order that upheld Adams's suspension. The order stated,

> THIS CAUSE came to be heard on March 8, 2019, on the Request for a Hearing filed by employee Rakasha Adams, appealing a ninety (90) day suspension from the City of Jackson's Police Department and the Commission having heard testimony and being fully advised in the premises finds as follows: That the disciplinary action in this matter was made in good faith and for cause and was not made for political reasons.

¶18. On May 29, 2019, Adams filed a notice of appeal in the Hinds County Circuit Court pursuant to Rule 5.04 of the Uniform Civil Rules of Circuit and County Court Practice. On July 15, 2019, Adams filed a motion to compel submission of the record pursuant to Rule 5.05, which states that assistance of the court should be sought if the record of the lower authority is not filed within thirty days. UCRCCC 5.05.

¶19. On April 1, 2021, the Hinds County Circuit Court issued an order affirming the Commission's decision. The order stated:

> Appellant was place[d] on a 90-day suspension without pay **for violation of the City of Jackson's Police Department vehicle pursuit policy and Rules 2.1 Performance and Duty and 2.2 Conduct and Behavior of the Jackson**

12

**Police Department Rules and Regulations**.[9]

> [A]fter considering the record below finds that there did exist substantial and sufficient evidence presented by the City of Jackson's JPD that its actions in suspending the Appellant was not arbitrary or capricious, that the decision of the Board was within the authority of the COMMISSION, and that said decision did not violate any constitutional right of the Appellant.

(Emphasis added).

¶20. Adams appealed the circuit court's decision to the Mississippi Supreme Court. On November 23, 2021, the parties filed a "joint motion" to remand the case for the "limited purpose of having the Commission set forth the Commission's underlying reasoning with sufficient clarity and specificity." On December 21, 2021, the Mississippi Supreme Court granted the motion and issued an order stating:

> Based on *Roberts v. City of Jackson*, 324 So. 3d 282 (Miss. 2021), the parties ask the Court to remand the matter to the Civil Service Commission with instructions to: (1) "issue an amended order setting forth the Commission's reasoning in affirming the suspension;" and (2) "comply with Mississippi Code [Annotated section] 21-31-23[,] which provides that 'the findings of the [C]ommission shall be certified in writing to the appointing power, and shall be forthwith enforced by such officer.'"

In response to the supreme court's order, the Commission amended its original order and issued an amended order,[10] which is part of the record on appeal.

---

[9] As previously mentioned, the record does not contain a copy of JPD's "Vehicle Pursuit" policy. The record also does not contain copies of JPD's "Performance and Duty Rules" or JPD's "Conduct and Behavior Rules and Regulations." This Court is limited to the policy definitions and rules and regulations explanations provided in the briefings and vaguely mentioned during the Commission hearing.

[10] The Commission's amended order was not dated, and it cannot be determined from the record when the Commission issued its amended order.

¶21. Adams now appeals from the Hinds County Circuit Court's judgment affirming the Commission's decision. On appeal, Adams makes the following arguments: (1) the Commission's order did not satisfy Mississippi Code Annotated section 21-31-23 (Rev. 2015) as to specificity and the required findings; (2) no substantial evidence supported the Commission's decision that Adams was engaged in a pursuit; and (3) the ninety-day suspension without pay was not supported by substantial evidence.[11]

## STANDARD OF REVIEW

¶22. Where a party appeals from a circuit court's judgment ruling on an appeal from a civil service commission's finding, our standard of review is limited to whether "the action of the [Commission] was in good faith for cause." *Sequerna Banks v. City of Jackson*, 295 So. 3d 571, 572 (¶5) (Miss. Ct. App. 2020) (quoting *Necaise v. City of Waveland*, 170 So. 3d 616, 618 (¶9) (Miss. Ct. App. 2015)). "Intertwined with this question [of good faith] is whether or not there was substantial evidence before the . . . Commission to support its order and whether it is arbitrary, unreasonable, confiscatory, and capricious." *Id.*; *accord Bowie v. City of Jackson Police Dep't*, 816 So. 2d 1012, 1017-18 (¶20) (Miss. Ct. App. 2002) (quoting *City of Meridian v. Hill*, 447 So. 2d 641, 643 (Miss. 1984)). This Court "shall only inquire into whether or not the judgment appealed from is reasonable and proper according to the facts disclosed before the [Commission]." *City of Jackson v. Froshour*, 530 So. 2d 1348, 1355

---

[11] We find issues one and two are dispositive and therefore, will not address issue three in this opinion.

14

(Miss. 1988). Moreover, this Court may only reverse the Commission's decision if it is "not supported by substantial evidence; (2) arbitrary or capricious; (3) beyond scope or power granted to the agency; or (4) violates one's constitutional rights." *Pepper v. City of Jackson*, 88 So. 3d 806, 808 (¶8) (Miss. Ct. App. 2012) (quoting *Sprouse v. Miss. Emp. Sec. Comm'n*, 639 So.2d 901, 902 (Miss. 1994)).

## ANALYSIS

**1.    Did the Commission's amended order satisfy the statutory requirement imposed by section 21-31-23?**

¶23.    On appeal, Adams asserts that the Commission failed to certify its findings in writing as required by section 21-31-23. In relevant part, section 21-31-23 states, "[t]he findings of the commission shall be certified in writing to the appointing power . . . ." In addition to this statutory requirement regarding written findings, the Mississippi Supreme Court has held that the "Commission is under a duty to set forth with sufficient clarity and specificity the reason it is upholding the action taken by the city . . . ." *Froshour*, 530 So. 2d at 1355.

¶24.    In *Roberts v. City of Jackson*, 324 So. 3d 282, 284 (¶9) (Miss. 2021), the Mississippi Supreme Court addressed the statutory requirements imposed by section 21-31-23 and the Commission's duty to set forth sufficient findings to support its decision. In that case, Roberts's employment was terminated from JPD for violating various rules and regulations. *Id.* at 283 (¶2). Roberts appealed his termination to the Commission, and after the hearing, the Commission entered an order affirming Robert's termination. *Id.* The Commission's order stated, "[T]he disciplinary action in this matter was made in good faith and for cause

15

and was not made for political reasons." *Id.* Roberts appealed the Commission's order to the circuit court, and the circuit court affirmed Robert's termination. *Id*. at (¶3). Roberts then appealed the circuit court's decision to the supreme court, and the case was assigned to this Court. *Id.* On its own motion, this Court entered an order finding that the Commission had "failed to comply with the statutory requirement that its findings be in writing and ordered the Commission to "submit written factual findings . . . stating with clarity and specificity the reason for upholding the action of the City of Jackson." *Id.* at (¶¶4-5). In response, the Commission amended its order with the following language:

> The Civil Service Commission affirmed the dismissal of Justin Roberts for the cause(s) set forth in the termination letter and supported by the evidence presented during the investigation. Therefore, the order was rendered in good faith for cause. The Commission's nor the City's order was not arbitrary, unreasonable, confiscatory, or capricious.
>
> The Commission found that the action taken by City of Jackson applied [t]he General Orders of Jackson Police Department. There was no evidence presented other than that which was presented during the investigation as shown on the transcript of the hearing (see attached).

*Id.* at 285 (¶16). This Court found that the Commission's amended order "complied with the statutory requirements of [s]ection 21-31-23" and that the amended order "set forth the reasons for [the Commission's] findings with sufficient clarity and specificity." *Id.* at (¶17). Roberts then filed a petition for writ of certiorari, and the supreme court granted the petition. *Id.* at 283 (¶6). The supreme court found that the Commission's response did not comply with statutory requirements and reversed the decisions of this Court and the circuit court. *Id.* at 286 (¶20). The supreme court explained that the Commission's response "failed to

16

identify with any clarity or specificity . . . the exact rules or policies it found Roberts had violated or the exact hearing evidence the Commission relied upon to reach its decision." *Id.* Therefore, as a result of the Commission's insufficient response, the supreme court was not able to determine whether "the action of the [Commission] was in good faith for cause" or whether "there was substantial evidence before the [Commission] to support its order[,] and whether the decision is arbitrary, unreasonable, confiscatory, and capricious." *Id.* (¶19) (quoting *Necaise*, 170 So. 3d at 618 (¶9)).[12]

¶25. In this case, in accordance with the supreme court's order, the Commission amended its order and included specific findings regarding Adams's violation. The amended order included the pertinent language of the policy and articulated that "even though Adams stated that the act of travelling [sic] or following behind the car did not constitute a pursuit, the Commission finds that Adams initiated a pursuit as defined in the General Order." The amended order also stated that Adams "admitted that she had emergency lights activated, and the driver refused to yield or stop for the lights and was driving in a legal manner." Finally, the amended order identified the evidence it considered for the basis for affirming Adams's

---

[12] In reaching the holding in *Roberts*, the Mississippi Supreme Court referenced *Bowie v. City of Jackson Police Department*, 816 So. 2d 1012 (Miss. Ct. App. 2002). In *Bowie*, the Court of Appeals directed the Commission to amend its original order to comply with the statutory requirements of section 21-31-23. *Bowie*, 816 So. 2d at 1018 (¶22). In response, the Commission issued an amended order that stated specific details relating to Bowie's termination and the Commission's basis for affirming Bowie's termination. *Id.* After considering the amended order, the Court of Appeals concluded the order satisfied the statute. *Id.* at (¶23).

17

suspension. Accordingly, this Court finds that the amended order satisfied Section 21-31-23, and the Commission performed the statutory and procedural duties imposed by statute and caselaw. This issue is without merit.

**2. Was there substantial evidence to support the Commission's finding that Adams engaged in a pursuit?**

¶26. Mississippi Code Annotated section 21-31-23 defines the role and task of a civil service commission's investigation. The Commission's "review of a city's decision to remove, suspend, demote, or discharge a civil-service employee is limited to determining whether the 'disciplinary action was or was not made for political or religious reasons and was or was not made in good faith for cause.'" *Bates v. City of Natchez*, 247 So. 3d 338, 339 (¶5) (Miss. Ct. App. 2018) (quoting § 21-31-23). "'Good cause' and 'good faith' shall be given a broad meaning that will include, but not be limited to, assuring that discipline of the department is not discriminatory or arbitrary in nature, but is fair, balanced, measured to consider the unique and individual circumstances of each matter . . . ." *Prendergast v. Harrison Cnty. Sheriff's Dep't*, 329 So. 3d 1203, 1212 (¶28) (Miss. Ct. App. 2021). "The Commission will affirm the disciplinary action taken against the employee only when the evidence is conclusive." *Chavis v. Jackson Cnty. Sheriff's Dept.*, 291 So. 3d 355, 359 (¶12) (Miss. Ct. App. 2019) (citing *City of Laurel v. Brewer*, 919 So. 2d 217, 221 (¶13) (Miss. Ct. App. 2005)).

¶27. Intertwined with the question of good faith for cause is whether there was substantial evidence before the Commission to support its order or "whether it was arbitrary,

18

unreasonable, confiscatory, and capricious." *Prendergast*, 329 So. 3d at 1208 (¶18) (citing *Bourgeois v. City of Bay St. Louis Civ. Serv. Comm'n*, 270 So. 3d 1039, 1045 (¶20) (Miss. Ct. App. 2018) (quoting *Pub. Emps.' Ret. Sys. v. Marquez*, 774 So. 2d 421, 425 (¶13) (Miss. 2000))). The Mississippi Supreme Court has defined substantial evidence as "evidence that is more than a scintilla; it must do more than create a suspicion . . . ." *Chavis*, 291 So. 3d at 360 (¶14) (quoting *Miss. Real Est. Comm'n v. Anding*, 732 So. 2d 192, 198 (¶13) (Miss. 1999)). "For a decision to be supported by substantial evidence, the underlying evidence must provide a substantial basis of fact from which the fact in issue can be reasonably inferred." *Seals v. Pearl River Resort*, 301 So. 3d 585, 587-88 (¶5) (Miss. 2020).

¶28. If the Commission's decision is supported by substantial evidence, the Commission's actions are not arbitrary or capricious. *Fisher v. Jackson Cnty. Sheriff's Dep't*, 328 So. 3d 704, 711 (¶12) (Miss. Ct. App. 2021) (citing *Miss. Transp. Comm'n v. Anson*, 879 So. 2d 958, 964 (¶17) (Miss. 2004)). But if the Commission "entirely failed to consider an important aspect of the problem, or **offered an explanation for its decision that runs counter to the evidence before the agency** or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the Commission's action is arbitrary or capricious. *Donovan v. City of Long Beach*, 104 So. 3d 166, 169 (¶12) (Miss. Ct. App. 2012) (emphasis added).

¶29. Moreover, the Mississippi Supreme Court has consistently held "inherently probable, reasonable, credible and trustworthy testimony uncontradicted by the evidence must be

19

accepted as true." *James v. Mabus*, 574 So. 2d 596, 600 (Miss. 1990); *see also Ryals v. Douglas*, 205 Miss. 695, 722-23, 39 So. 2d 311, 317 (1949) ("[N]either the chancellor nor a jury has an arbitrary right to disregard testimony, which is neither inconsistent with the laws of nature, and which is not contradicted either by direct or circumstantial evidence. The presumption is that men testify truthfully, and such testimony cannot be destroyed arbitrarily. There must be some legal reason for disregarding testimony."); *Stevens v. Stanley*, 153 Miss. 809, 122 So. 755, 755 (1929) ("The jury as well as the judge, is bound by uncontradicted, reasonable testimony. . . .").

¶30. Here, the record clearly shows that there is an undeniable difference between a routine traffic stop, which is not a violation of JPD's pursuit policy, and a pursuit, which is a violation. Moreover, the City could not articulate an explanation as to why Officer Adams's actions were not a traffic stop or at what moment the traffic stop escalated to a pursuit, and the Commission failed to consider this important aspect.

¶31. Officer Adams testified, without dispute, that she was not attempting to "apprehend a suspect" or "make an arrest." She stated that she could have written a ticket or given a verbal warning. She also stated that she did not believe the driver's behavior was evasive and that she had to make a "judgment call." She explained officers are accustomed to individuals not immediately pulling over due to safety concerns when stopped for traffic offenses. She stated:

> [Drivers] may not feel safe at that time; they may be going to their house to park their vehicle because they don't want their vehicle towed; they may be in

20

the middle of the highway, and they have to pull over to the side, or they may be pulling into a store. . . . If you are working on the night shift, it may be too dark in that area, and they may be going to a store. There are plenty of reasons that a car is not going to stop as soon as you flip your blue lights

¶32. A review of the uncontradicted evidence produced at the Commission hearing demonstratively proved the decision by the Commission was contrary to the substantial evidence. It is without dispute Officer Adams witnessed the Pontiac driving carelessly by rolling past the stop sign and weaving and running another vehicle off the road. It is without dispute that Officer Adams and the driver of the Pontiac were not speeding and only traveled at speeds between ten and twenty miles per hour. It is without dispute the entire incident lasted less than four minutes and involved 1.23 miles in distance. It is without dispute that neither Corporal Taylor nor Officer Adams used patrol-car sirens. It is without dispute Corporal Taylor stopped at a traffic light while assisting Officer Adams, and when it turned red, he waited for the light to change to green before he moved.[13] It is without dispute the Pontiac driver demonstrated no evasive behavior. It is without dispute that Corporal Taylor did not radio dispatch about a "pursuit" because he never considered the events to be a "pursuit." It is without dispute Corporal Taylor and Officer Adams both testified that it was not a pursuit. In addition, co-appellant Corporal Taylor, as a ranking officer who knew the pursuit policy and had years of experience, testified that he did not believe their actions constituted a "pursuit." Expert Chief Dunston, an individual with thirty-five years of police

---

[13] It is hard to imagine that a police officer engaged in a "pursuit" would stay stopped at a red light and not proceed again until the red light changed to green.

experience and instructor at the police academy, testified Officer Adams's actions were not a pursuit, and he would teach this in his class as a "non-pursuit." All these reasons combined proved by substantial evidence that Officer Adams and Corporal Taylor were correct in their "judgment call" that the events that occurred were not a "pursuit" and not in violation of the policy that was used to suspend Officer Adams for ninety days without pay.

## CONCLUSION

¶33.    After reviewing the record, we find that the circuit court erred by upholding the Civil Service Commission's finding that Officer Adams was engaged in a "pursuit." The clear and substantial evidence was uncontradicted and proved that there was no pursuit. Therefore, we find the Commission's findings were not supported by substantial evidence and were arbitrary and capricious, and we reverse the circuit court's judgment and remand the case to the Commission for a determination of restitution consistent with this opinion.

¶34.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  WESTBROOKS, J., NOT PARTICIPATING.**

22