# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CC-01339-COA

RITA JACK                                                   APPELLANT

v.

THE CITY OF MERIDIAN, MISSISSIPPI                     APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/13/2023 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | FRANCIS STARR SPRINGER |
| ATTORNEYS FOR APPELLEE: | WILLIAM WYATT SIMMONS |
| | KATE SPRABERY DAVIS |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 03/04/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND WEDDLE, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1. City of Meridian Police Lieutenant Rita Jack appealed her employment termination to the Meridian Civil Service Commission. After conducting a hearing, the Commission affirmed the City's decision to terminate Jack's employment. Jack appealed from the Commission's decision to the Circuit Court of Lauderdale County, which affirmed the Commission's decision. Jack now appeals the circuit court's order, alleging (1) that her termination was arbitrary and capricious and not in good faith, (2) that the City did not provide substantial evidence that Jack violated policies, and (3) that Jack was treated differently from two white male officers who acted similarly and were not terminated. Having reviewed the record, the arguments of counsel, and relevant precedent, we affirm the

decision of the circuit court.

**Facts**

¶2. At the time her employment was terminated on October 4, 2022, Jack was a full-time police lieutenant and a twenty-six-year employee of the Meridian Police Department. She was assigned to handle various community-related duties such as Crime Stoppers and Neighborhood Watch.

¶3. The mayor of Meridian, Jimmy Smith, lived next door to Jack and noticed Jack's service vehicle (a black Tahoe) parked at her home during work hours (8:00 a.m. to 5:00 p.m.). When the mayor questioned Police Chief Deborah Young about Jack, Chief Young launched an internal affairs investigation of Jack on April 26, 2022. Internal Affairs Investigator Orlando Clark began surveillance and photographed Jack's service vehicle parked at her home during working hours twenty-eight times over the next four months. During his investigation, however, neither Clark nor Chief Young (or "the Chief") ever interviewed Jack. Chief Young determined that on various dates and times, Jack clocked in and claimed to be at work but, in fact, she was at her personal residence with no proof that she was working. However, the police department had issued her two laptop computers on which a time clock was installed for Jack to clock in to work when necessary.

¶4. Clark gathered AT&T phone records for Jack's city-issued phone, her email logs, payroll information, shift notes, time sheets, pay history, and other documents. For each of the twenty-eight days documented, Clark reported the time Jack clocked in and the location of that clock-in (remotely at her residence). He noted the time of her first phone call, her

email activity, the time she clocked out, and her location at that time. Clark reviewed any daily shift notes that Jack may have reported that day. For example, on May 2, 2022, Clark noted that Jack reported: "8:03 p.m. - late leaving office due to completing paperwork for new group." Clark would then enter his own surveillance notes. For example, on May 4, 2022, Clark noted:

> On 05.04.2022, a surveillance was conducted at Lt. Rita Jack's residence, in reference to her on duty time. Lt. Jack clocked in at 0800 hours. On this date, I, Investigator Orlando Clark, rode by Lt. Jack's residence and noticed that her City of Meridian service vehicle was backed in under her garage, next to her white SUV. I then parked a few feet away, but close enough to observe if and when Lt. Jack would leave her residence. At 0951 A.M. I observed Lt. Jack's service vehicle exit from under her garage. . . . A photo was taken of this incident.

On another day, May 13, 2022, Clark noted that Jack clocked in at 8:00 a.m. At 9:33 a.m., Clark rode by the residence and saw the service vehicle still parked in the garage. Clark called the Chief and confirmed that Jack was still clocked in. Clark parked and watched the house until 2 p.m., and Jack's service vehicle did not move. Clark left and returned at 2:55 p.m. to find the vehicle still backed into the garage as before. At 3:57 p.m., Clark drove by again, and the service vehicle's door was open. Clark returned a short time later and found Jack's vehicle had left. All this time, Jack was clocked in as working. In Clark's reports, he noted the phone records showed that on most days, Jack did not receive or make any phone calls before noon, nor send or receive emails until later in the afternoon, if at all.

¶5.     Clark's investigation ended on August 26, 2022. In a seventy-four-page investigative report, which included photographs and summaries, Clark documented that Jack routinely clocked in to work from her residence but only later reported for duty at the station. She

3

clocked in twenty-eight times claiming to be at work when she was actually at home. On one day, she spent two-and-a-half hours at a beauty salon during work hours.

¶6.    On September 27, 2022, the City served Jack with a "Notice of Intent to Impose Disciplinary Action," which in her case was termination. The notice listed numerous Meridian Civil Service Rules she had allegedly violated, including but not limited to neglect of duty, incompetence, incidents of carelessness, violation of police department work rules, and malfeasance, misfeasance, or nonfeasance in the performance of her work. The thrust of the termination was Jack's falsification of her time records. Along with the notice of intent to terminate her employment, Jack was served with a letter from the mayor putting her on administrative leave, along with a binder containing Clark's seventy-four-page investigation report with documents, photographs, and two flash drives of surveillance videos. On that same day, Chief Young sent the mayor a summary of the investigation and the policies that she determined Jack had violated.

¶7.    After being served with the City's notice of intent to terminate her employment, on September 30, 2022, Jack submitted a one-page written response to the mayor. She claimed that the report was untrue and that because her duties were unique, she was provided with a laptop so she could clock in remotely. She asserted that she could present evidence to show the hours charged to the City were legitimate; however, she presented no specifics in the letter.

¶8.    Finding Jack's written response insufficient, Jack's employment was terminated on October 4, 2022. Mayor Smith confirmed the termination on October 11, 2022. Jack

4

appealed the termination to the Meridian Civil Service Commission[1] because as a civil service employee, Jack could only be discharged for cause pursuant to Mississippi Code Annotated 21-31-23 (Rev. 2015).

### Appeal to the Meridian Civil Service Commission

¶9.    On November 17, 2022, attorneys for Jack and the City met with the attorney for the Commission to discuss the issues to be considered by the Commission on appeal.  The parties agreed to a six-page "Agreed Stipulation," in which the parties outlined their respective arguments, listed the evidence to be submitted at the Commission's hearing, and listed the witnesses that would testify.

¶10.    On November 29, 2022, the Commission convened a hearing on Jack's appeal, with the Commission's attorney acting as the hearing officer and the commissioners acting as fact-finders.  Commissioners Gregory Elliott (chairman), Ralph Henson, Kathi Wilson, Johnny Moore, and Wilbert Jones were present.  The City called several witnesses, including Chief Young, Jack, Clark, and Mayor Smith.

### a. Chief Deborah Young

¶11.    Chief Young, who assumed her position in August 2021, testified that in November 2021, she met with Jack to discuss hours on Jack's time records that Chief Young had disapproved. Former Chief Benny Dubose and acting Assistant Chief Patrick Gale were also present at the meeting.  Chief Young said that she directed Jack to obtain approval before working any extra hours and that she and Jack met privately after that meeting and discussed

---

[1] The City of Meridian had established a civil service system under Mississippi Code Annotated section 21-31-1 (Rev. 2015) that covered its police department.

Jack's request to be moved from the Bonita Lakes Mall precinct to the department headquarters. The Chief granted that request and moved Jack to the main police station. Jack was given a desk, a desktop computer, and the service vehicle (a Tahoe) that Jack had requested. The Chief also assigned Jack recruiting duties. Jack's working hours were from 8:00 a.m. to 5:00 p.m., and she was to report to work each day at the police department. The Chief said Jack was not given permission to work at home, though she could go to the mall precinct to work if needed. The Chief stated that she never authorized Jack to clock in on her laptop.

¶12.  The Chief testified that at one point, Jack had taken a COVID-19 test and was told to isolate and not work until the results came back in one or two days. Jack reported this diagnosis to the Chief, who told Jack that she would need to take sick time. Jack then requested to work from home, and the Chief said she would speak with others in the administration. The Chief said she was relatively new and wanted to check with the acting Assistant Chief Gale and former Chief Dubose before responding to Jack's request. Chief Young ultimately determined that Jack could not work from home and relayed this decision to Jack.

¶13.  The Chief described Jack's duties, which included working with the various neighborhoods in the city to set up neighborhood watches and identifying potential recruits. Usually Jack worked with four neighborhood watch meetings a month, and normally her work would be done between 8:00 a.m. and 5:00 p.m. The Chief pointed out that being late for work (e.g., reporting at 9:00 a.m. when you were due at 8:00 a.m.) is different from

6

clocking in and showing up later (e.g., clocking in at 7:30 a.m. and showing up at 9:00 a.m.). The latter was basically falsifying one's time records.

¶14.    The Chief said she did not "tacitly approve" of Jack's actions by failing to speak to her about them while the investigation was ongoing. According to the Chief, she had already spoken to Jack in November 2021, and things went well for a while; however, then Jack started this pattern of conduct that the investigation documented. Thus, the Chief felt the progressive discipline procedure had been followed. The Chief admitted, however, that she approved Jack's hours while the investigation was pending because Jack "had explanations on there for HR, so I did approve them." The Chief also admitted that there was one officer who did work from home, Officer Bradley, when he had knee surgery. He was in charge of training that is usually done on the computer. Because he could conduct his training while at home, she gave him permission to do that while he was recovering. The Chief said that there was no written policy on working from home because "law enforcement does not work from home."

¶15.    The commissioners were allowed to ask questions, and during their questioning, the Chief stated that it was typical for an administrator not to interfere with an investigation until it is completed. One commissioner noted section 10.4 of the progressive discipline policy and asked why Jack's infraction was so severe that progressive steps were insufficient such that termination was necessary. The Chief responded that she had already had a conversation with Jack about her hours in November 2021 and that she expected Jack, as one of the highest officers with years of experience, to do the right thing. The Chief also pointed out

7

that the dismissal part of the policy read that dismissal may also be appropriate "in response to an infraction of such severity that a lesser action is clearly insufficient." The Chief admitted that she did not involve Jack's direct supervisor, who was acting Assistant Chief Gale, but the Chief herself had initiated the investigation.

¶16. The Chief was also asked if any other officer had gotten in trouble for falsifying time records. The Chief said that to her understanding, there were several officers under federal indictment for falsifying records. One officer, Jay Arrington, was on suspension, and his termination hearing was pending before the Commission.

### b. Lieutenant Rita Jack

¶17. Jack testified that during the hours her service vehicle was at her home, she was there "suited and booted and ready to respond to calls." While at home, she said she would read emails, respond by text, and prepare paperwork for the crime prevention programs and Neighborhood Watch meetings that she oversaw. Moreover, she testified she actually worked after she was supposed to clock out at 5:00 p.m. For example, she pointed out that she was in charge of the Crime Stoppers program and that if she received a tip in the evening, she would not wait until 8:00 the next morning to respond. Jack told the commissioners that she had recorded the November 2021 meeting with the Chief, which she (Jack) had initiated because the Chief had removed hours from her payroll time sheets. Jack said the meeting dealt only with the four hours that Jack worked on a Sunday; nothing was said about her needing to be at the police department at any certain time.[2]

---

[2] Jack said she had the recording, but it was not produced before the hearing or entered into evidence.

¶18. Jack said she worked "independent, very independent of any other operations in the Department." She insisted that if the Chief had any questions about why she was at home, then the Chief could have asked her. But Jack said she only found out about issues about her job performance when she received the Notice of Disciplinary Action and was sent home. Jack said that the Chief never told her she could not work remotely or from home. The only time they spoke about "working from home" was during COVID-19. Jack testified that the Chief never responded to her about her request to work at home at that time, and Jack was surprised to see that a text message was apparently sent to her about it that she claimed she did not receive. In addition, Jack said that she was surprised to hear that the Chief was expecting her to work in the office when community relations, in her opinion, was not work she could perform from behind a desk. Jack said her duties were unique and that she never received directions or orders to report at any time to the police department or even to the mall precinct. Jack explained that under a prior chief, she was directed to take her laptop to their technology personnel and they installed a "clocking-in" program. This was done while she was still working at the mall precinct. Jack said there was no policy that she could not clock in on her laptop; officers had laptops in their cars that they used to clock in. Jack also stated that she could not confirm or deny that the vehicle parked in her carport was her service vehicle because her son bought a similar dark SUV that he often parked there.

¶19. On cross-examination, Jack stated that Chief Young never told her where to work, "period," and that she was never instructed to come to the police station at 8:00 a.m. in the morning. She also denied asking to be moved from the precinct to the main station. Jack

9

testified that she was up, "suited and booted" by her clock in time. When at home, she worked on her computer at her kitchen counter. She said she left

> when I complete[d] what I need[ed] to do and I head[ed] to wherever, but it's not always the office, if I even make it to the office that day. I may not even go into the office for an entire week because my office may be out canvassing the neighborhood with the residents to promote participation in the Neighborhood Watch.

She confirmed, however, that her working hours were 8:00 a.m. to 5:00 p.m. Counsel for the City proceeded to go through sample dates of the investigative report with Jack, confirming the times she clocked in, times when emails were sent, and times when the service vehicle was at the house or photographed leaving the home. Jack admitted that her service vehicle was photographed being parked in front of the beauty salon for two hours on one workday, and she admitted that she went there during work hours. Jack claimed this was done on her lunch hour, but then Jack added that the Chief went to the barbershop while "on the clock" as well and that they all would go to the doctor's office or grocery store on the clock. But if called to duty as law enforcement officers, they all respond.

¶20. Jack also admitted that she had been previously disciplined under the administrations of other mayors—once in 2020 for improper use of police software.[3] She said her employment had been terminated twice before, and on both occasions, the Commission reversed the City's decision.

¶21. Although Jack entered a 126-page exhibit of text messages she purportedly made

---

[3] Jack said she had two hearings on other matters currently pending before the Commission. One hearing was held on May 26, 2022, and another in July 2022. However, no testimony was provided concerning the substance or specifics of those matters.

10

during the time of the investigation, she did not testify specifically about them or show how they refuted the City's allegations against her. At the hearing, she admitted that she personally had not gone through the texts to compare them to the dates in the internal affairs report.

### c. Investigator Orlando Clark

¶22. Orlando Clark testified about the Internal Affairs Investigation report he prepared.[4] He said that his goal was to either prove or disprove the allegations against Jack. He said that each photo of a dark SUV was of Jack's service vehicle because it had a specific number on it. In addition to photographs, he said he also prepared a video of a time when her vehicle actually left her residence. Clark explained his procedure of going to Jack's home, determining whether she had clocked in, and seeing how long she stayed at the house while on the clock. Some days, like August 16, 2022, when her service vehicle was not at the house, he would go by her hair salon because he was told she often was there during the day. On that day, he photographed her vehicle at the hair salon at 9:11 a.m. It was still parked there at 10:23 a.m., and he recorded her leaving the salon at 11:43 a.m. and returning home that day. Clark stated that his review of Jack's text messages and emails confirmed that she was not working during these times her vehicle was at the house. However, he conceded that not getting a text or an email did not mean Jack was not working. He also conceded that the

---

[4] Clark was assigned to internal affairs at the time. He had previously worked under Jack, and he said she disciplined him a few times. However, he said she had not been unfair in her punishment. His previous experience with her did not affect his investigation. He had attended FBI training in internal affairs investigations and this was not his first internal affairs investigation.

car parked in the carport did not mean Jack was home.

¶23.    In answering questions from the commissioners, Clark noted that he often would interview the person, but in this case, he did not.  Although "from an investigation side," it was different not to interview Jack, it was up to the administration to determine what needed to be done after he gave them his information.  Clark also clarified that the purpose of his investigation was to see if Jack was at home when she was actually clocked in.  When asked, Clark said he knew of some officers who went to the barbershop or hair salon during work hours, but he could not say that it was routinely done.  Clark said that he had reviewed the text messages that Jack provided, and his review did not change the conclusions he reached.

### d. Mayor Jimmie Smith

¶24.    Mayor Jimmie Smith testified that he lived next door to Jack and he noticed several days when her service vehicle was in the driveway after work hours had begun.  After noticing this for about a week, he mentioned it to the Chief.  He confirmed that he signed the termination letter, which he issued because Jack had violated work policies by not going to work.  Smith said that it had no bearing that Jack had told him that she would support Smith for mayor this time, but the next time, she was going to support "the other guy."  When asked if he had a problem that the policy concerning progressive discipline was not followed, Smith said there were exceptions to the policy.

¶25.    After the City rested, Jack presented no rebuttal witnesses.  The parties made closing arguments, and the commissioners went into executive session to deliberate but adjourned because of imminent bad weather.

*December 8, 2022 Reconvened Commission Hearing*

¶26. On December 8, 2022, the Commission reconvened and conferred in an executive session, of which no record was made. Upon coming out of executive session, Commissioner Henson moved, and Commissioner Moore seconded, Henson's motion that the Commission confirm the decision of the City concerning Jack. Henson then read into the record his position that the City had conducted a fair and impartial investigation into the charges against Jack. He noted that she clocked in to work at home and remained there on twenty-eight occasions during the four-month internal affairs investigation. He gave, as an example, July 5, 2022, when Jack clocked in at 6:56 a.m., left for the office at 12:26 p.m., attended a Neighborhood Watch meeting that evening, and clocked out at 7:00 p.m., "working" for a total of eleven-and-a-half hours. However, between 6:45 a.m. and 12:26 p.m., she sent no emails, had no texts, and made no phone calls until 2:00 p.m. that day.

¶27. Henson continued that on July 11, 2022, Jack asked to work from home pending the outcome of a COVID-19 test. She was told that the days would be counted as sick days and that she could not work from home. But Jack continued to do so, even working unapproved overtime. Jack admitted that on August 16, 2022, she went to the hair salon for two-and-a-half hours while on the clock.

¶28. Commissioner Wilson disagreed with Henson, saying that he did not see that the decision to terminate Jack was made in good faith or based on substantial (more than a scintilla) of evidence. Wilson felt that the internal affairs investigator did a great job taking pictures to establish that Jack was at home, but Clark admitted that his role was not to

determine what she was doing while at home.

¶29. Chairman Elliott commented that the Mississippi Supreme Court had defined substantial evidence as evidence that is more than a scintilla. It must do more than create a suspicion; it must show bad faith. Moreover, a commission may reverse a city's disciplinary action only if it were made for political reasons, religious reasons, or made in bad faith. Elliott said he had reviewed the evidence and testimony, and it was troubling to him that the Chief told Jack that she would get back with her about working from home during COVID-19 after she checked with administration. But when asked to whom in administration the Chief had spoken, the Chief named former Chief Dubose, who is not in administration. Moreover, there was an employee at the training center who was given permission to do the same thing Jack was not allowed to do. There was no proof that Jack was ever late for work or failed to show up or be at her post. Elliott felt that Jack's supervisor could have handled any discipline necessary rather that launching a "whole Internal Affairs investigation." Elliot concluded that an "organizational culture" had existed in the department for a long time, that Jack was allowed to do her own thing and was not checked on. The police department did not provide a job description for exactly what Jack was supposed to be doing.

¶30. Elliott felt that the City had not provided enough evidence to prove that Jack was not working. Elliott moved to modify the termination decision to change it to a suspension, probation, or even a demotion. He said that he felt Jack was never given an opportunity to "right her wrong." Elliot formally moved that Jack should not be paid for the time off, that a suspension should be extended, and that the Commission should consider demotion.

Commissioner Wilson was the only one to agree, and three other commissioners (Henson, Moore, and Jones) voted against the motion. The Commission then voted 3-2 to uphold the City's termination of Jack's employment.

¶31. After the vote, Elliott asked the commissioners if any of them had listened to any audio recording that was not presented at the formal hearing or talked to anyone about such an audio recording. All responded they had not.[5]

¶32. On December 14, 2022, the Commission issued its written order concerning the termination, finding that Jack had admitted that she was often not working at times when she was at home but had clocked in. Moreover, after being told in July 2022 that she could not work from home pending a COVID-19 test, Jack continued to do so. Jack also admitted that she was at the hair salon for two-and-a-half hours while on the clock, violating the rules of conduct in conducting personal business while on duty. The City had presented photographs of Jack at home while clocked in. Substantial evidence showed that Jack clocked in to work at home and remained at home on twenty-eight occasions during the four month investigation. The Commission found that this violated "304 Rules of Conduct: 2.3 Truthfulness - falsifying an official document."

> For example, on July 6, 2022, Jack clocked in at 6:56 a.m., left for the office at 12:36 p.m., attended a Neighborhood Watch meeting that evening, and clocked out at 7:00 pm. for a total of 11 ½ hours of work. But between 6:56 and 12:26, she sent no emails, had no text messages, and made no phone calls until 2:19 p.m. She worked overtime without approval; she was required to

---

[5] Apparently, the recording of the Chief's meeting with Jack in November 2021 was posted on Facebook. The commissioners were alerted to this prior to the December reconvened hearing, and they were instructed not to listen to or consider any outside evidence.

receive permission. This violated 3.04 Rules of Conduct: 1.11 Conduct Unbecoming - e. Misuse of Government funds or property, and f. falsification of government time records.

The Commission found that in the wake of the COVID-19 test exchange between them, the Chief informed Jack that she could not work at home. But Jack continued to do so. This violated the rules of conduct regarding reporting for duty. The Commission stated that it can only reverse a city's action if the termination was made for political reasons, religious reasons, or not made in good faith for cause. Further, it will affirm the disciplinary action when the evidence is conclusive and if there is substantial evidence of cause. The Commission stated that Jack had the burden of proving that her termination was made in bad faith. The Commission found that the City had acted in good faith for cause in terminating Jack and affirmed the City's decision.

*Appeal to Circuit Court*

¶33. On December 28, 2022, pursuant to Mississippi Code Annotated section 21-31-23,[6] Jack appealed the Commission's ruling to the Circuit Court of Lauderdale County, claiming that the disciplinary action against her was arbitrary, capricious, politically motivated, and not in good faith for cause, and thus the Commission's affirmation was also not in good faith

---

[6] This section provides:

> The findings of the commission shall be conclusive and binding unless either the accused or the municipality shall, within thirty (30) days from the date of the entry of such judgment or order on the minutes of the commission and notification to the accused and the municipality, appeal to the circuit court of the county within which the municipality is located.

Miss. Code Ann. § 21-31-23.

for cause. After the record of the Commission proceedings was filed, the parties briefed the issues.

¶34. On November 13, 2023, the circuit court issued its order affirming the Commission's ruling. The court noted the limited scope of its review, namely determining whether the Commission acted in good faith for cause. The court reviewed the record of the internal affairs investigation, noting that it revealed that Jack had clocked in to work while remaining at home and conducting personal business while on duty. The court reviewed the findings of the Commission and stated that the court was not to make a "credibility determination," reweigh the evidence, or "determine issues of fact regarding whether an employee was guilty of the charge or not." The only issue is whether the Commission acted in good faith based on the evidence before it. The court concluded that "based on the evidence and testimony before the Commission," "the Commission's ruling was supported by substantial evidence in the record."

¶35. On December 13, 2023, Jack appealed the circuit court's decision. Jack argues that (1) her termination was arbitrary and capricious and not in good faith, (2) that the City did not provide substantial evidence that Jack violated policies, and (3) that Jack was treated differently from two white male officers who acted similarly and were not terminated.

**Standard of Review**

¶36. "A discharged police officer may appeal his or her termination to a civil service commission, which shall determine whether the decision to terminate the officer was or was not made for political or religious reasons and was or was not made in good faith for cause."

17

*Breland v. City of Hattiesburg*, 276 So. 3d 1217, 1221 (¶9) (Miss. Ct. App. 2018). Under Mississippi Code Annotated section 21-31-23, the findings of the Commission may be appealed to the circuit court. However, "on appeal, the circuit court is limited to determining whether the act of the commission was or was not made in good faith for cause." *Fisher v. Jackson Cnty. Sheriff's Dep't*, 328 So. 3d 704, 711 (¶11) (Miss. Ct. App. 2021).

¶37. If the circuit court's decision is appealed, we apply the same standard of review. "Where a party appeals from a circuit court's judgment ruling on an appeal from a civil service commission's finding, our standard of review is limited to whether 'the action of the [Commission] was in good faith for cause.'" *Adams v. City of Jackson*, 360 So. 3d 999, 1008 (¶22) (Miss. Ct. App. 2023) (quoting *Sequerna Banks v. City of Jackson*, 295 So. 3d 571, 572 (¶5) (Miss. Ct. App. 2020)). This is a very limited standard of review, and "this Court is not to determine issues of fact regarding whether an employee was guilty of the charge or not, but should only determine whether the Commission acted in good faith based on the evidence before it." *Bowie v. City of Jackson Police Dep't*, 816 So. 2d 1012, 1018 (¶20) (Miss. Ct. App. 2002). Intertwined with the question of good faith for cause is "whether or not there was substantial evidence before the [Commission] to support its order[,] and whether the decision is arbitrary, unreasonable, confiscatory, and capricious." *Roberts v. City of Jackson*, 324 So. 3d 282, 283 (¶7) (Miss. 2021). "Moreover, this Court may only reverse the Commission's decision if it is '[(1)] not supported by substantial evidence; (2) arbitrary or capricious; (3) beyond scope or power granted to the agency; or (4) violates one's constitutional rights.'" *Adams*, 360 So. 3d at 1008 (¶22) (quoting *Pepper v. City of Jackson*,

18

88 So. 3d 806, 808 (¶8) (Miss. Ct. App. 2012)).

## Discussion

**I.     Whether Jack's termination was arbitrary and capricious, not in good faith, or not supported by substantial evidence.**

¶38.    At the outset, we note that this Court is not called upon to determine issues of fact regarding whether an employee committed the alleged misconduct. *Renfro v. City of Moss Point*, 156 So. 3d 913, 917 (¶19) (Miss. Ct. App. 2014). Nor is this Court to make credibility determinations of the evidence or testimony when determining if the Commission's order was made in good faith for cause. *Id.* The question before us as an appellate court that is reviewing the circuit court's assessment of a civil service commission's decision is whether the act of the Commission was made in good faith for cause. *Conwill v. City of Columbus*, 293 So. 3d 297, 302 (¶14) (Miss. Ct. App. 2020).

¶39.    The issue of "good faith" is intertwined with whether there was substantial evidence to support the Commission's order and whether it was arbitrary or capricious. *Adams*, 360 So. 3d at 1008 (¶27). If a Commission's decision is supported by substantial evidence, then it is not arbitrary or capricious. *Id.* at 1010 (¶28); *see also Grant v. City of Columbus*, 812 So. 2d 976, 978 (¶6) (Miss. 2002) (holding if credible evidence exists substantiating the commission's action, the decision was in good faith for cause).

> "Good cause" and "good faith" shall be given a broad meaning that will include, but not be limited to, assuring that discipline of the department is not discriminatory or arbitrary in nature, but is fair, balanced, measured to consider the unique and individual circumstances of each matter. *Prendergast v. Harrison Cnty. Sheriff's Dep't*, 329 So. 3d 1203, 1212 (¶28) (Miss. Ct. App. 2021).

*Adams*, 360 So. 3d at 1010 (¶26). "For a decision to be supported by substantial evidence, the underlying evidence must provide a substantial basis of fact from which the fact in issue can be reasonably inferred." *Seals v. Pearl River Resort*, 301 So. 3d 585, 587-88 (¶5) (Miss. 2020). "Moreover, the Mississippi Supreme Court has consistently held 'inherently probable, reasonable, credible and trustworthy testimony uncontradicted by the evidence must be accepted as true.'" *Adams*, 360 So. 3d at 1011 (¶29) (quoting *James v. Mabus*, 574 So. 2d 596, 600 (Miss. 1990)).

¶40.    "The burden to show that the commission acted in bad faith or without cause is upon the appellant employee." *Ladnier v. City of Biloxi*, 749 So. 2d 139, 154 (¶59) (Miss. Ct. App. 1999) (citing *Stegall v. City of Meridian*, 230 Miss. 176, 180, 92 So. 2d 331, 332 (1957)). In an attempt to satisfy her burden, Jack argues several points that she claims prove the Commission acted in bad faith, arbitrarily, and without good cause. However, from our review, we find that Jack either misstates the record or that the other evidence in the record outweighs it to substantially support the Commission's actions.

¶41.    As an example of misstating the record, Jack claims that Clark "refused" to talk to her. However, Clark testified that Chief Young never instructed him to talk to Jack and that he did not need to. Clark said that he performed an investigation as he was charged to do, namely, to determine if Jack was at home while on the clock, which he could do by observing her service vehicle in the carport during working hours. Clark, who was trained in internal affairs investigations, said he did not need to talk to Jack about this. Thus, Clark never "refused" to interview Jack. Jack further mistakenly argues that an officer under federal

20

indictment for falsifying time records was still employed. However, the testimony during the hearing was clear that the officer under indictment was suspended and that his termination hearing was pending before the Commission.

¶42. Further, Jack argues the City and Commission's actions were in bad faith because she claimed that City policy required that she be interviewed. We assume that Jack is referring to the City's progressive discipline policy, which includes employee counseling prior to more severe disciplinary actions. However, the policy on dismissal (Section 10.04 of the Rules and Regulations of the Meridian Police Department) clearly includes situations when progressive discipline may be bypassed. The policy provides that dismissal may be the result of, but not necessarily limited to, insubordination such as violating a published City or department rule or for neglect of duty including intentionally falsifying time or leave records. Because the Chief was proceeding under this policy, she was not required to interview Jack.

¶43. Jack contends that the City failed to show that she did not work the hours she claimed. However, the burden was on Jack to show the Commission that she was working the hours and days that the City claimed she was not. The only "proof" Jack presented were copies of texts with various dates (some within and some outside the investigative time period between April and August 2022) that referred to Neighborhood Watch activities and others. However, most of those texts were not generated during the morning hours (e.g., between 8:00 a.m. and 11:00 a.m.) when Jack claimed she was on duty and working. During these times on the specific dates in the internal affairs report, the City showed that Jack made and received no emails or texts and made no calls. Jack had not presented substantial evidence

21

that during the hours in question she had in fact been working. Moreover, Jack clearly violated policy when she admitted she went to the hair salon while on the clock. Her defense to this was that the Chief and other officers did the same, but the Chief denied going to the salon during work hours, and although Clark testified that some officers went to the barbershop, he said this was not done routinely. Jack named no specific officer who had done the same, been reported to the Chief, and been treated differently. Also, Jack presented no evidence that any other officer falsified his or her time records while at a salon or shop.

¶44. Jack further contends that because the Chief approved the work hours she submitted, she could not be guilty of falsifying records. The City counters that the Chief approved Jack's hours while the investigation was pending. The situation is like an employer who learns that an employee has stolen money from the cash register. It is the employer's prerogative to take immediate action or to observe and see if this was a pattern of behavior. In this case, the Chief decided to document the pattern she saw developing and present conclusive proof of the accusations against Jack.

¶45. Jack argues that the Chief acted arbitrarily because another officer was allowed to work from home, but she was terminated for doing so. However, the Chief testified that as a rule, department personnel were not permitted to work remotely. The only exception the Chief made was for Officer Bradley, who was in charge of training that he could conduct over the computer. Bradley had undergone knee surgery, and the Chief gave him permission to work from home because he could still fulfill his duties. Unlike Bradley, the Chief testified that she told Jack that she could not work from home. Although Jack disputes this

testimony, the Commission, not this Court, was the judge of the credibility of the witnesses.

¶46.    The commissioners' discussions during the December 8, 2022 reconvened hearing reflect that each commissioner had thoroughly reviewed the record and facts presented, both for and against termination.  The Commission considered alternatives to termination but ultimately voted to affirm Jack's termination.  From our review of the record, we conclude that the decision of the Commission was supported by substantial evidence, was made in good faith for cause, and was not arbitrary or capricious.  The City documented twenty-eight instances of Jack clocking in while at home and remaining there for hours before leaving. Jack presented no evidence of work being done during the early morning hours she claimed to be on duty.  The Chief testified that she had told Jack she could not work at home and provided her with an office at department headquarters.  Still, Jack continued her pattern of clocking in from home and not leaving until hours later.  Jack claims that there was no evidence that she falsified records; however, there was a substantial basis from the evidence presented from which this fact in issue can be reasonably inferred.  Accordingly, we find the Commission's decision was made in good faith for cause.

###    II.    Whether Jack was treated differently from two allegedly similarly situated male officers.

¶47.    Jack also argues that the Commission ignored "bad faith evidence" of the Chief's disparate treatment of Jack.  Jack argues that the Chief testified that there were two other police officers (whose races were not identified in the record) "who were allowed to do the things Rita Jack was fired for."  However, again Jack misstates the evidence in the record, or the evidence does not support her argument.

¶48. Jack referred to the transcript of the Commission proceedings where the Chief discussed former Lt. Arrington, who was suspended for falsifying time records and whose termination hearing was pending before the Commission. Clearly, Jack was not being treated differently than Arrington; they were being treated the same. Both were accused of falsifying time records, and both were suspended pending termination hearings.

¶49. Jack also claims she was similarly situated to Officer Bradley but treated differently when the Chief allowed him to work at home. But Jack was not similarly situated to Bradley, whose job was to conduct training over the computer. When Bradley was physically unable to come to the office due to knee surgery, the Chief let him work at home because he could perform his duties at the computer at home. Jack's job duties were completely different and could not, for the most part, be done at home. Moreover, she had no physical limitation that required her to be at home for a considerable length of time. The Chief's actions were not arbitrary when she treated Bradley differently.

## Conclusion

¶50. Because there was substantial evidence presented to the Commission that Jack had violated City and Department policies, we affirm the circuit court's ruling that the Commission's act of sustaining the City's termination of Jack was made in good faith for cause and was not arbitrary or capricious.

¶51. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. LAWRENCE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

24